# J. FURR WHITE

*vs.*

# PHILIP D. LAIRD ET AL.

*Election laws: primary elections: marking ballots; "black lead pencils." Supervisors of elections: appeals from judges of election; jurisdiction and discretion. Mandamus: when writ will not be issued.*

The requirement of section 185 of Article 33 of the Code, that election ballots shall be marked with a black pencil, are not violated by marking them with a black indelible pencil.    p. 126

The powers and jurisdiction, given to the Supervisors of Elections by section 199 B of Article 33 of the Code, to hear and determine appeals from the action of judges of election, etc., require them to exercise judgment and discretion, and to act in a *quasi*-judicial capacity.      p. 123

In the absence of improper motives on the part of the Supervisors, no appeal lies from their decisions in matters over which they have control; nor will a writ of mandamus be issued to control their action.      pp. 129-132

*Decided December 2nd, 1915.*

Appeal from the Circuit Court for Montgomery County. (URNER, C. J., and WORTHINGTON, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON and STOCKBRIDGE, JJ.

*T. Howard Duckett* (with whom was *Marion Duckett* on the brief), for the appellant.

*Charles W. Prettyman* and *James Dawson* (with whom were *Thomas Dawson, Talbott & Prettyman* and *J. Dawson Williams* on the brief), for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The appellant and the appellee, Philip D. Laird, were candidates for nomination for the House of Delegates from Montgomery County on the Democratic ticket at the primary election held in that county on the 14th of September, 1915. The Board of Canvassers certified that the appellant received 1946 votes and Mr. Laird 1955 votes—three other candidates having more votes than they, and the contest being between them for the fourth place, as that county was entitled to four delegates. The appellant filed a petition with the Supervisors of Elections, asking that the ballots cast be recounted and recanvassed, and on September 24, 1915, the Supervisors, sitting for the purpose of recounting and reviewing said ballots and acting under section 199-B of Article 33 of the Code, proceeded to recount and recanvass the ballots cast at said primary election for the appellant and the appellee, Laird, and they determined that Mr. Laird had a majority of three votes. The appellant filed a petition for a *mandamus* to compel the Supervisors of Elections to reject 120 ballots which they counted and to count four which they rejected and to declare the result of the election accordingly.

A demurrer was filed to the answer of the Supervisors, and a motion to quash part, and a demurrer to the other parts of the answer of Philip D. Laird were filed. In the answer of Mr. Laird there was a demurrer to the petition, questioning the authority of the Court to grant a *mandamus* upon the case stated in the petition. The lower Court passed an order sustaining the demurrer of Mr. Laird and dismissing the petition. From that order this appeal was taken.

In the case of *Foxwell* v. *Beck,* 117 Md. 1, it was decided that the primary election law did not provide for a contest over a nomination. That case was decided November 22nd, 1911, and by an Act approved January 10th, 1912, provision was made for an appeal to the Supervisors of Elections, and for a recanvass and recount of the ballots cast. Section 160-Y, Chapter 2 of Laws of 1912, being 199-B of Article 33 of Code (Vol. 3).

The two acts of the Supervisors relied on in the petition as the ground for the mandamus are: 1st. That the Supervisors counted 120 ballots (64 of which were marked for Laird and 56 for White) which were not marked with a black lead pencil, but with an indelible pencil; and 2nd. That they rejected four ballots not defective upon their face, three being for petitioner and the other blank as to them.

The lower Court based its order on the ground that "the authority conferred by the law upon the Board of Supervisors for conducting and determining such appeals as the one instituted by the present petitioner clearly involves the exercise of judgment and is consequently not a proper subject for revision or regulation in a *mandamus* proceeding." The statute (sec. 199-B of Art. 33) gives the right of "appeal from and review of the action and decision of the judges of election in counting ballots and for a recanvass and recount of the ballots cast," etc., and the Supervisors are "given jurisdiction and power to hear and determine said appeals; to review and correct the action of the judges of election in their respective jurisdiction and to recanvass, recount and certify said result of said primary election. And for all the purposes of said review, recount, recanvass, etc., the said Supervisors of Elections shall act and be judges of election for counting said ballots, acting as such in the premises within their respective geographical jurisdictions." It further provides that the Supervisors shall "produce before them the ballot-boxes, returns, tally sheets and paraphernalia of said election and shall proceed forthwith in a summary way without answer, pleading or technicality, and without

requiring any evidence to be taken or proof submitted, to review the actions of the judges of elections and recount the ballots in the precincts named in said petition," etc., and "said review, recount and recanvass shall be had with all possible expedition and dispatch and in preference to all other business under such mode of procedure as the Supervisors of Elections shall prescribe by means of tellers appointed by them on the recommendation of and with equal representation to the opposing candidates. The said Supervisors to pass upon and decide whether any ballot contested by the tellers for either side shall be rejected or counted."

In section 185 of Article 33 there are provisions governing the judges of elections in reference to the count, and it is provided amongst other things, that "the intention, so far as the same may be ascertained from each ballot itself, shall, in the absence of any unlawful or fraudulent mark or device thereon or enclosed therewith or on the envelope containing the same, prevail."

There would seem to be no room to doubt that the Supervisors are called upon and required to exercise judgment and discretion in the discharge of their duties and act in at least what is called a *quasi* judicial capacity. Anyone who has had experience in contested elections in Courts knows how difficult it often is to determine whether a particular ballot shall or shall not be counted under existing statutes—sometimes requiring the closest scrutiny of the ballots and marks, and demanding the very best judgment the Court is capable of exercising. Other references to statutes might be made to show that the duties of the Supervisors are far from being merely ministerial. In order to grant the *mandamus* the Court would have been compelled to substitute its judgment for that of the Supervisors, as to whether the 120 ballots should be rejected, or the four ballots counted. The Supervisors saw and examined them, in the presence of the tellers and counsel of the parties, and they were required by the statute "to pass upon and decide whether any ballot con-

tested by the tellers for either side shall be rejected or
counted."

It may be well to more specifically state the questions the
Supervisors were called upon to decide, as shown by the
pleadings. We will first consider the 120 ballots. The peti-
tion alleges: "That at said session and during all of said re-
count and recanvass, your petitioner, by counsel, objected to
certain ballots being counted to the number of one hundred
and twenty (120), sixty-four (64) of which were marked
for the said Laird, and fifty-six (56) of which were marked
for your petitioner, upon the ground that said ballots so pro-
tested were not marked as required by law with a black lead
pencil, said ballots being marked otherwise legally for the
said Laird or for your petitioner with a pencil other than a
black lead pencil, as required by law, namely, with indelible
pencil."

The respondent Laird, in his answer, states that, "there
were a number of ballots protested by the tellers both for the
contestant and this respondent, for various reasons, and that
in each case the protest was heard and determined by the
Board of Election Supervisors, as by law they were required
to do, and said ballots so contested were counted or rejected
in accordance with the findings of said board in each par-
ticular case. He admits that in some instances the reason
given for the protest on the part of the tellers for the said
J. Furr White, contestant, was that said ballots had been
marked by an indelible pencil, but this respondent does not
admit that the marking of said ballots was so done or that
that was a material or proper reason for the rejection of said
ballots, but this respondent does not know the number of
ballots contested for this reason, nor how many of them were
cast for either of the parties to said contest, nor does he
esteem it a material fact, as the Board of Supervisors had
by law, in each instance, the right and power to decide as to
whether or not such votes should be counted and did in fact,
upon each of said protests, decide the questions so presented
to them."

The Supervisors in their answer "admit that counsel for petitioner objected to certain ballots being counted (the exact number of which is unknown) upon the ground 'that said ballots were marked with an indelible pencil and not with a black lead pencil as required by law.' These respondents deny that said ballots were counted contrary to law and in derogation of the rights of the petitioner, but aver that on inspection and passing upon said ballots the respondents, the said Board of Supervisors of Elections, determined them to be properly marked and voted, and that the marks appearing on said ballots were not distinguishable from black pencil marks, as was their duty so to determine. These respondents further deny that the pencils used by the voters in marking said protested ballots were of a character different from that required to be, or in plain violation of the purpose and intent of the law, but aver and charge that no vote was counted for any of the contesting candidates, after whose name a cross-mark made with a black pencil did not appear."

Section 185 of Article 33 provides that after the voter obtains his ballot, "he, the voter, shall thereupon retire to one of the booths provided for the purpose, taking with him said blank ballot, and shall there with *black pencil,* and in the manner required by law, prepare such official ballot for voting." At the end of that section there are these provisions: "If in Baltimore City or in any county more names are marked for any office than there are persons to be voted for, such ballots shall not be counted for such candidates or delegates, or other persons to be voted for, as the case may be; but the whole ballot shall not for that reason be rejected for candidates for other offices or positions, if any, and a ballot marked by any other than a *black lead pencil* shall not be counted. No vote shall be counted in any such county for any person, after whose name a cross-mark made with a *black pencil* does not appear on the ballot when voted."

It will thus be seen that the voter is directed to mark his ballot when he retires to the booth *"with black pencil,"* and

if he has previously prepared his ballot the statute does not in that part of the section say with what kind of pencil it shall be marked. While it does later say "a ballot marked by any other than a black lead pencil shall not be counted," it in the very next sentence states "No vote shall be counted *in any such county* for any person after whose name a cross-mark made with a *black pencil* does not appear on the ballot when voted." If any distinction between the two was intended, it might be argued that in the counties only a "black pencil" was intended to be required," but when the statute itself used the term "black pencil" twice, and in so many words directs the voter to mark his ballot with a *"black pencil,"* can it be possible that votes (in this case to the number of 120, according to the appellant) are to be rejected because they are not marked with a *"black lead pencil,"* although they were marked with a *"black pencil"*? Is the voter required to have a chemical or some kind of analysis made, to ascertain whether his "black pencil" is a "black lead pencil," in order to be sure of his vote? Is he to inquire of the election officials whether the pencils they have provided, and are in the booths, are "black lead pencils"? Inasmuch as the General Election Laws provide that the voter shall mark his ballot with an "indelible pencil," and it is well known that there is little, if any, lead in what we ordinarily call "lead pencils," and it is not shown that there are not indelible pencils which (at least unless moistened) make as black marks as the ordinary pencils in use, it might have a tendency to cause the average voter to believe that the primary election law of Maryland is a snare and delusion, rather than a method of obtaining honest nominations, if Courts must hold ballots to be invalid for such reasons. But as, in our judgment, it is not for us to determine the question in this case, we leave the above inquiries and suggestions without further comment or answer. All we need now say is that it was under the circumstances clearly and unquestionably a matter for the judgment and determination

of the Board of Supervisors, and their conclusion thereon was not subject to review by the Court.

In reference to the four ballots rejected, the petition alleges, "that while the respondents, the said Board, were engaged in the recount of the Democratic ballots for the Second Precinct of the 13th (Wheaton) District, and after all but six of the ballots in the Democratic ballot box had been passed upon by the respondents and counted or rejected, that six (6) ballots found to be separately strung and tied were objected to by counsel for said Laird because of the fact that they may have been rejected by the judges of election, and upon examination by the Board of Supervisors it was found that two (2) of said ballots were plainly and manifestly wrongfully marked and ought to have been and probably were rejected by the judges of election, but nothing was discovered upon the other four (4) said ballots to indicate that they were open to any objection or that they were not legal ballots legally cast and entitled to be counted; that none of said ballots were marked rejected, defective or spoiled, nor was there any indication upon any of them as to the action of the judges of election, and that notwithstanding that your petitioner insisted that said ballots should be passed upon by said board, and counted or rejected as they might appear upon their face, the board, without reviewing said ballots, but after an inquiry of one of the judges of election, rejected all of said six (6) ballots; that of the four (4) ballots not defective upon their face, three (3) were cast and should have been counted for your petitioner, the fourth being blank as to both your petitioner and said Laird," etc.

. The Supervisors answered by saying that they deny "that after discovering the six ballots which were separately strung and tied and contained in the ballot box of the Second Precinct of the Thirteenth District, they illegally and in derogation of the petitioner's rights rejected said ballots, but aver and charge that after they had counted all of said ballots in said box which were properly marked there were in a package separately strung and tied together six ballots two of

which were spoiled and properly rejected. That the count-
ing of the four remaining ballots was objected to on the
part of the respondent Laird because the fact that they were
contained in the separate package with two ballots manifestly
wrongfully marked rendered it reasonably certain that the
judges of election for said precinct had for certain reasons
rejected said ballots. Whereupon after hearing both the peti-
tioner and the respondent Laird, it was suggested that in-
quiry be made of the judges of election for said Second Pre-
cinct of the Thirteenth District, which was entered into and
agreed upon by the counsel for both sides; and that these
respondents accompanied by counsel for both petitioner and
the respondent Laird, visited one of the judges of election of
said precinct, then sitting as officer of registration in said
precinct, and were by him informed of the exact number of
spoiled and rejected ballots to be found in said box, namely,
two that were spoiled and defective and four that were
erroneously delivered to Republicans on the day of the pri-
mary and by them attempted to be voted, but were refused;
and were further informed that the total number of spoiled
and rejected ballots, numbering six in all, were tied in a
separate package and strung with the other ballots in said
box, all of which tended to substantiate the objections of the
respondent Laird. That before passing upon said four bal-
lots these respondents again returned to the Court House in
Rockville, where said recanvass was being conducted, and
upon further consideration, and after determining in their
own minds whether or not said ballots should be counted, and
exercising the discretion vested in them, rejected said bal-
lots." The answer of Mr. Laird is to the same effect.

It is true that the appellants sought to have the action of
the Supervisors as to the four ballots reconsidered, and filed
a petition together with some affidavits to sustain the con-
tention that the Supervisors had been misinformed or mis-
understood the facts as to said four ballots, but without decid-
ing whether they could legally reopen the case after they had
finished the recount, etc., and certified the result, their an-

swer shows that the petition was set down for hearing and
after hearing arguments by counsel on both sides they denied
the petition. Without meaning in any way to reflect upon
any of these gentlemen, or undertaking to decide between
them, there was certainly some ground, not to say strong
ground, to cause the Supervisors to hesitate to reopen the
case, even if they could legally have done so. Neither of the
two judges of elections, whose affidavits were filed, attempt
to give any explanation as to why the four ballots were
separately strung and tied up with the two ballots, which
were confessedly invalid, all of which were admitted to have
been found in the Democratic ballot-box. Nor does either
of them assign any reason why the four Democratic tickets
were placed in the Republican box, as they claim was done
with the four tickets obtained by the four Republican voters
and then taken from them. The Democratic judge was the
one whom the Supervisors and the counsel of the parties
interviewed, and his affidavit is in direct conflict with what
the Supervisors state in their answer, which was sworn to by
the three, occurred in the interview with that judge of elec-
tion. We speak of these things simply to show that their
refusal to reopen the case cannot be said to have necessarily
been unreasonable, arbitrary or for improper motives—re-
gardless of the more important question as to their power to
do so. If they had the power to reopen the case, it was at
least in their discretion not to do so, under such circum-
stances as we have stated, especially when the great danger
of adopting such a course, when the result is as close as it
was in this case, is considered. The Supervisors were un-
questionably required to pass on those ballots and did so. If
the position of appellant be correct, then it matters not which
way they decided, the losing party could have asked the aid
of the Court, although no appeal is provided for. For if the
appellant was entitled to a *mandamus* to require the Super-
visors to count them, then, if they had been counted, the
appellee Laird might have had the right to a *mandamus* to
require them to reject, or not count them. It cannot be said

that there was a failure or refusal to act, for they did act
and passed judgment on them, and, even if it be conceded
that they were not compelled, or even authorized to go to the
registration office of the precinct to see the judge of election,
they did so with the consent of the attorneys of the appellant
and appellee, Laird. But even if they had not obtained such
consent, how that can furnish any ground for a *mandamus*
we are at a loss to know.

It is not correct to say, "that there was no indication any-
where from anything found in the ballot box that they were
not legal ballots." The fact that the six ballots were "found
to be separately strung and tied," and that two of them
"were plainly and manifestly wrongfully marked and ought
to have been and probably were rejected by the judges of
election," as the petition alleges, or "were in a package
separately strung and tied together," as the answer of the
Supervisors states, or "there were in a package to themselves
tied together and separated from the other ballots six ballots,
two of which were on their faces spoiled and improper to be
counted," as Mr. Laird's answer says, naturally suggested
that they were for some reason different from those which
were strung together, and counted by the judges of election,
especially as that box did not have an envelope or package
containing spoiled or rejected ballots. The Supervisors were
evidently endeavoring to obtain the best information they
could, and there is no suggestion of any fraud or intentional
wrongdoing on their part. When they found the four ballots
with two confessedly invalid ballots, they certainly had the
right to seek some explanation, and by the very terms of the
statute they were required to pass upon and decide whether
those ballots contested by the tellers of the one side should
be rejected or counted. It is not for the Court to determine
whether they were right or wrong in their determination,
any more than it would have been as to any other contested
ballots. There may have been other ballots counted or re-
jected for the one or other of the two candidates concerning
which the Court might differ with them, but that would not

justify a *mandamus* to require them to decide as the Court might think they ought to have decided. We express no opinion as to whether their conclusion was right, but hold that even if it be conceded they were wrong in making the inquiries they did, and as they did, that of itself would not justify the Court in issuing a *mandamus,* as it was merely an irregularity and they in point of fact passed on the ballots and there was unquestionably some ground for the conclusion they reached. If the question could thus be opened up, then the other side might ask for a *mandamus* for some other irregularity, and so the proceedings could be involved in such delay as would endanger the right of whichever one was entitled to be the nominee of his party to have his name placed on the ticket in time. Such delays are not contemplated, or authorized by the statute.

The case of *Miles* v. *Stevenson,* 80 Md. 358, is much relied on by the appellant. Stevenson was appointed Supervisor of certain public roads, for two years and until his successar was appointed and qualified. The statute only gave the County Commissioners the power to remove a road supervisor during the term "for incompetency, wilful neglect of duty, or misdemeanor in office." This Court said: "In the case at bar the cause alleged was not one of those set forth in the statute, and for that reason the County Commissioners' act in removing the relator was a nullity. The order removing him was passed *ex parte,* without notice to or a hearing of the relator, and for that additional reason was utterly invalid." That was therefore a wholly different case from this, and there is nothing in the opinion which can sustain this application for a *mandamus.* The well established doctrine "that the writ of *mandamus* does not lie to control the discretion of any tribunal, however limited its jurisdiction may be" was repeated, and none of the exceptions to the rule mentioned are applicable here. The case of *Price* v. *Ashburn,* 122 Md. 514, was also a totally dissimilar case. There the Board of Canvassers refused to canvass the returns of an election district, which the law required them to

canvass. It was said by JUDGE BRISCOE: "It has been repeatedly held, that the duties of canvassing officers are purely ministerial and, under the facts of this case, the canvassers could only canvass and declare the result as shown by the returns."

We do not quite understand the theory of appellant, that independent of his right to an ordinary *mandamus,* he was entitled to relief under section 86 of Article 33. That section applies to the Board of Canvassers, and while it is true that Board is composed of the Supervisors of Election, they organize specially as a Board of Canvassers for the purposes mentioned in the statute—being required to elect a chairman and secretary from their number, and each member is required to take the oath of office prescribed. Their powers are wholly different from those conferred on them as Supervisors of Election by section 199-B. Moreover, this was an application for a *mandamus,* and not for such relief as section 86 affords, when applicable.

As no application was made to amend the petition and prayer, as was suggested by the separate opinion of JUDGE WORTHINGTON he thought might be done, and as he concurred in the order appealed from, we have not thought it necessary to determine the point suggested by him.

Being of the opinion that no sufficient ground was shown by the record to justify the Court in interfering with the exercise of the judgment and discretion reposed in the Supervisors of Election of Montgomery County, we affirmed the order appealed from by a *per curiam* order dated October 21st, 1915.