774 A.2d 1167

The **CITY OF SEAT PLEASANT, et al.,**

v.

**Thurman D. JONES, Jr.**

**No. 105, Sept. Term, 2000.**

Court of Appeals of Maryland.

June 27, 2001.

**666**

Frederick C. Sussman (Council, Baradel, Kosmerl & Nolan, P.A., on brief), Annapolis, for petitioners.

Joseph B. Chazen (Gina M. Smith, Meyers, Rodbell & Rosenbaum, P.A., on brief), Riverdale, for respondent.

J. Joseph Curran, Jr., Attorney General of Maryland, Judith A. Armold, Assistant Attorney General, Baltimore, brief of Maryland State Board of Elections filed on behalf of petitioners, amicus curiae,

Argued before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and LAWRENCE F. RODOWSKY (Retired, Specially Assigned) JJ.

BELL, Chief Judge.

This case presents the issue of the propriety of the issuance of a writ of mandamus by the Circuit Court for Prince George's County. That court issued the writ based on its conclusion that the Seat Pleasant City Board of Supervisors of Elections, one of the appellants,[1] acted arbitrarily and capriciously when it admittedly denied a registered voter the right to vote in that city's mayoral election, which was decided by a one vote margin, where the stipulation of the parties, in turn premised on the post-election declaration of that voter, was that she intended to vote for the candidate with the one vote deficit. We shall hold that the writ does not lie under the facts *sub judice* and, thus, reverse the judgment of the Circuit Court.

The election for the offices of Mayor and members of the City Council of the City of Seat Pleasant was conducted by the City Board of Supervisors of Elections on September 11, 2000, between the hours of 7:00 a.m. and 8:00 p.m. There were three candidates for the office of Mayor: Eugene F. Kennedy, the incumbent Mayor; Thurman D. Jones, Jr., the appellee; and Eugene Grant.

Brenda Brown Smith came to the polling place to vote at around 5:00 p.m. Although, at all times relevant to this case, Ms. Smith was registered to vote with the Prince George's

---

**1.** The other appellant is the City of Seat Pleasant. In his Verified Petition for Declaratory Relief, Temporary Restraining Order, and Permanent Injunction, the appellee named also Eugene F. Kennedy, the incumbent Mayor, and Eugene Grant as defendants.

County Board of Elections ("PGC Board") and resided in the City of Seat Pleasant, her name did not appear on the voter registration list or the voter authority cards that were provided to Seat Pleasant election officials by the PGC Board several days before the election. This occurred because Ms. Smith sent in her change of address form after the deadline for registration.[2] In addition, no "extract" file was prepared for the Seat Pleasant 2000 election.[3] An extract file is automatically created when an event, like the change of address in this case, occurs that could cause a voter's name to be omitted from the registered voter database.

Yvonne Sumner, the Chairperson of the Seat Pleasant Board of Supervisors of Elections, ("City Board"), attempted, unsuccessfully, to contact the PGC Board by telephone to determine whether Ms. Smith was registered to vote. Because the call was made after hours[4] and, therefore, the PGC Board offices were closed for the day, she was unable to reach

---

**2.** According to Robin Downs, acting Administrator of the PGC Board, Ms. Smith's name did not appear on the Seat Pleasant election day voter registration list or voter authority cards because the PGC Board had processed a change of address for her within 30 days of the election. Notwithstanding that Ms. Smith's old and new addresses both were located in Seat Pleasant, Ms. Downs testified that this caused the computer program that the PGC Board used to process the voter registration list and voter authority cards for the September 11 Seat Pleasant election to fail to recognize that Ms. Smith resided in Seat Pleasant on the registration cut-off date, which was 30 days before the election. Thus, Ms. Smith's name was omitted from the voter registration list and the voter authority cards that were printed by the PGC Board for the Seat Pleasant election.

The Circuit Court concluded that the omission of Ms. Smith's name from the voters' list was "[d]ue to an alleged computer error."

**3.** Ms. Downs testified that when an election day voter registration list is printed, a printout of an "extract" file also should be generated. An entry is automatically made to this extract file when an event occurs, such as a change of address, which may cause a voter's name to be omitted from the voter registration list. According to Downs, the PGC Board usually provides a municipality with the extract file printout along with the Election Day voter registration list, but did not prepare one for the Seat Pleasant 2000 election.

**4.** The regular business hours of the Prince George's County Board of Elections are 8:00 a.m. to 4:00 p.m., Monday through Friday.

anyone who could provide assistance. Ms. Sumner had not made advance arrangements with the PGC Board to have someone stay after hours on election day to respond to these kinds of inquiries.[5] When Ms. Sumner was unable to verify Ms. Smith's voter registration, Ms. Smith was informed that she would not be allowed to vote. Thereafter, Smith left the polling place without casting a ballot.

The City Board's tally of the ballots after the polls closed revealed, as to the election for the office of Mayor, that Kennedy received 247 votes, Jones received 246 votes, and Grant received 191 votes. Thereafter, it certified the results of the election to the Clerk of the City and Mr. Kennedy was declared Mayor. Dissatisfied, the appellee, on September 13, wrote to Ms. Sumner, requesting a recount of the ballots for Mayor "because one of my supporters, Brenda Brown Smith, . . . was denied the right to vote. . . ." He attached to the letter Ms. Smith's affidavit, which averred that she had been denied the right to vote and that she would have voted for the appellee had she been allowed to vote. Subsequently, on September 20, the appellee's counsel wrote to the City Board. In that letter, the City Board was asked to hold a hearing, to make formal written findings as to the actual number of votes cast for the candidates for Mayor and that Ms. Smith was denied the right to vote for the appellee, as she stated was her intention, and to refuse to certify the result. Counsel also requested that the City Board "formally recommend to the City Counsel that a new election be held, in which event the [C]ity Council should either conduct a new election to fill the office of Mayor or seek a declaratory judgment from the Circuit Court for Prince George's County upon the facts as found by the Board." There is an allegation that the City

---

**5.** Ms. Sumner testified that, having been instructed by the PGC Board to do so after normal office hours, when the office is closed, she called the direct telephone number of the PGC Board staff person with whom she usually dealt to obtain voter registration information. She also testified that, although not aware that she had to make a written request to the PGC Board to have a staff person working in the evening on the municipal election day, she did make an oral request to that effect shortly before the PGC Board's regular closing time.

Board was to hold a hearing on September 25, the same evening as the Seat Pleasant City Council met, prompting a letter from the appellee's counsel to the City Board, with a copy to the City Council, indicating his inability to attend and requesting that the hearing be put off until he and his client and all other interested parties and their counsel could attend. At the September 25 special meeting, where the City Board reported the results of the September 11 election and the appellee's challenge to the voting tally for the mayoral election was considered, the Seat Pleasant City Council determined that the appellee would have to pursue his challenge through judicial action.[6]

The appellee thereafter filed in the Circuit Court a two count Verified Petition for Declaratory Relief, Temporary Restraining Order, and Permanent Injunction.[7] In Count I, he sought a judgment declaring, consistent with the allegations,[8] that the City Board failed to allow Ms. Smith, a duly

---

**6.** Section C–608 of the Seat Pleasant City Charter provides:

"If any person is aggrieved by the action of the Board of Supervisors of Elections in refusing to register or in striking off the name of any person, or by any other action, he may appeal to the Council. Any decision or action of the Council upon such appeals may be appealed to the Circuit Court for the County within the time allowed for such appeals."

The parties agree that the proceedings to this point were pursuant to this provision of the Charter.

**7.** In its Opinion and Order of the Court, the Circuit Court noted that, in a Memorandum of Law, the appellee also requested mandamus relief. It is well settled, in any event, that this Court looks to the substance of an action, rather than how it is characterized. *See Gisriel v. Ocean City Bd. of Sup'rs of Elections*, 345 Md. 477, 496, 693 A.2d 757, 766–67 (1997). Thus, we have held, "even where a particular action against an administrative agency was allegedly brought under a statutory judicial review provision, and did not purport to be a mandamus action, this Court has looked to the substance of the action, has held that it could be treated as a common law mandamus or certiorari action, and has exercised appellate jurisdiction." *Id.* at 500, 693 A.2d at 768, citing *Criminal Inj. Comp. Bd. v. Gould*, 273 Md. 486, 500–06, 331 A.2d 55, 64–68 (1975).

**8.** In addition to alleging "a clear and significant irregularity prohibiting BOSE's [the City Board's] certification of the election results given the

registered and qualified voter, to vote in the City's September 11, 2000 election, resulting in a clear, significant irregularity in election procedure that would have changed the outcome of the election because there would have been a tie between Mr. Kennedy and the appellee for the highest number of votes. The appellee requested alternative relief-a run-off election or a new special election and that, pursuant to the Seat Pleasant Charter, the City must hold a run-off election between Kennedy and Jones or, alternatively, conduct a new special election. In Count II, the appellee requested a temporary injunction precluding the City from swearing in Kennedy and, following a hearing on the merits, a permanent injunction requiring the City to conduct a run-off election between the appellee and Mr. Kennedy or, alternatively, to hold a new special election for Mayor.

Following a hearing on the appellee's request for a temporary restraining order, the court granted the request and immediately and temporarily enjoined the City from swearing in Mr. Kennedy as Mayor for a new term and further ordering that, as the incumbent, he remain as Mayor of Seat Pleasant pending the outcome of the proceedings. A hearing on the merits was subsequently held, at which evidence was taken and the parties presented their arguments.

The Circuit Court found that the City of Seat Pleasant "wrongfully infringed upon Ms. Smith's fundamental right to vote." Relying on *Fowler v. Board of Supervisors of Elections for Prince George's County*, 259 Md. 615, 270 A.2d 660 (1970), it was persuaded that the result of the collective errors of the City and County Boards, and their failure to act with more deliberation than usual on election day, was the wrongful deprivation of her right to vote. More specifically, it faulted the City Board's failure to prevent the situation involving Ms.

---

fact that Smith's vote would have changed the outcome of the Election resulting in a run-off election between mayoral candidates, Petitioner and Kennedy" and asking the court to so find, the appellee also alleged in Count I that "[t]he actions and/or omissions of the City and BOSE were arbitrary, capricious, illegal and undertaken without any rational basis."

Smith, citing, in particular, Ms. Sumner's statement at the court hearing that "she did not follow the proper procedure in order to guarantee that someone from the County Board would be available after hours to assist her with voter registration inquiries" and the fact that Ms. Sumner, in any event, made only one attempt to call the County Board. As to the County Board, the court noted that it supplied the City Board with an incomplete list of voters, "fail[ing] the City Board" by not providing it with the "extract" file, which was a safeguard "to ensure that the polls would receive documentation for every registered voter." Concluding further that the City and County "irregularities" affected the fairness of the election-the court found ample evidence that, if she had been permitted to do so, Ms. Smith's vote would have resulted in a tie between the incumbent Mayor and the appellee and thus materially changed the election's outcome—and that their conduct was arbitrary and capricious, the court issued a writ of mandamus ordering that the City allow Smith to vote and, if a tie ensued, that a run-off election be conducted in accordance with the City Charter.

The appellants noted an appeal to the Court of Special Appeals. Subsequently, before any proceedings in the intermediate appellate court, both sides filed petitions for writ of certiorari. We granted the appellants' petition and denied the appellee's. Before we granted certiorari, the Circuit Court, on the appellants' motion, stayed enforcement of its Opinion and Order pending the completion and outcome of appellate proceedings, and also extended its earlier Order that Mr. Kennedy continue to serve as Mayor of Seat Pleasant pending the completion and outcome of appellate proceedings.

## II.

In *George's Creek Coal & Iron Co. v. Allegany County Comm'rs*, 59 Md. 255, 259 (1883), this Court observed, with regard to the writ of mandamus:

"Its office, as generally used, is to compel corporations, inferior tribunals, or public officers to perform their func-

tions, or some particular duty imposed upon them, which in its nature is imperative, and to the performance of which the party applying for writ has a clear legal right. The process is extraordinary, and if the right be doubtful, or the duty discretionary, or of a nature to require the exercise of judgment, or if there be any ordinary adequate legal remedy to which the party applying could have recourse, this writ will not be granted. The application for the writ being made to the sound judicial discretion of the court, all the circumstances of the case must be considered in determining whether the writ should be allowed or not; and it will not be allowed unless the court is satisfied that it is necessary to secure the ends of justice, or to subserve some just or useful purpose."

■ Subsequently, we said in *Lamb v. Hammond*, 308 Md. 286, 292, 518 A.2d 1057,1060 (1987), quoting from *Hammond v. Love*, 187 Md. 138, 144, 49 A.2d 75, 77 (1946):

"In *Hecht v. Crook*, 184 Md. [271], [280–81], 40 A.2d [673], 677 [1945] this Court, by Judge Henderson, said: 'Courts have the inherent power, through the writ of mandamus, by injunction, or otherwise, to correct abuses of discretion and arbitrary, illegal, capricious, or unreasonable acts; but in exercising that power care must be taken not to interfere with the legislative prerogative, or with the exercise of sound administrative discretion, where discretion is clearly conferred.' "

■ Most recently, in *Goodwich v. Nolan*, 343 Md. 130, 144, 680 A.2d 1040, 1047 (1996), this Court reviewed the history of the common law writ of mandamus. We stated:

" 'Mandamus is an original action, as distinguished from an appeal.' 2 Am.Jur.2d Mandamus § 4 (1970) (footnote omitted). It is 'not a substitute for appeal or writ of error.' *In re Petition for Prohibition*, 312 Md. 280, 306, 539 A.2d 664, 676 (1988). It is, however, 'an extraordinary remedy[,]' *Ipes v. Board of Fire Commissioners of Baltimore*, 224 Md. 180, 183, 167 A.2d 337, 339 (1961), 'that . . . will not lie if [there is] any other adequate and convenient remedy[.]' *A.S. Abell*

*Co. v. Sweeney,* 274 Md. 715, 718, 337 A.2d 77, 79 (1975) (quoting *Applestein v. Baltimore,* 156 Md. 40, 45, 143 A. 666, 668 (1928)). Mandamus is generally used 'to compel inferior tribunals, public officials or administrative agencies to perform their function or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party ∙applying for the writ has a clear legal right.' *Criminal Injuries Compensation Board v. Gould,* 273 Md. 486, 514, 331 A.2d 55, 72 (1975); *see also George's Creek Coal & Iron Co. v. County Commissioners,* 59 Md. 255, 259 (1883). The writ ordinarily does not lie where the action to be reviewed is discretionary or depends on personal judgment. *Board of Education of Prince George's County v. Secretary of Personnel,* 317 Md. 34, 46, 562 A.2d 700, 706 (1989); *In re Petition, supra,* 312 Md. at 305–06, 539 A.2d at 676; *see also Tabler v. Medical Mutual Liability Insurance Society,* 301 Md. 189, 202 n. 7, 482 A.2d 873, 880 n. 7 (1984); *Bovey v. Executive Director, HCAO,* 292 Md. 640, 646, 441 A.2d 333, 337 (1982); *Maryland Action for Foster Children v. State,* 279 Md. 133, 138–39, 367 A.2d 491, 494 (1977)."

■■■■■■■ We further explained:

"This Court has stated that judicial review is properly sought through a writ of mandamus 'where there [is] no statutory provision for hearing or review and where public officials [are] alleged to have abused the discretionary powers reposed in them.' *State Department of Health v. Walker,* 238 Md. 512, 522–23, 209 A.2d 555, 561 (1965). *See also State Department of Assessments and Taxation v. Clark,* 281 Md. 385, 399, 380 A.2d 28, 36–37 (1977); *Gould,*[ ], 273 Md. at 502, 331 A.2d at 65; *State Insurance Commissioner v. National Bureau of Casualty Underwriters,* 248 Md. 292, 300, 236 A.2d 282, 286 (1967); *Heaps v. Cobb,* 185 Md. 372, 380, 45 A.2d 73, 76 (1945). Thus, prior to granting a writ of mandamus to review discretionary acts, there must be both a lack of an available procedure for obtaining review and an

allegation that the action complained of is illegal, arbitrary, capricious or unreasonable."

*Id.* at 146, 680 A.2d at 1048.

The writ of mandamus has been utilized in cases involving a variety of election challenges. *See, e.g., Gisriel v. Ocean City Board of Supervisors of Elections,* 345 Md. 477, 693 A.2d 757 (1997); *Roberts v. Lakin,* 340 Md. 147, 665 A.2d 1024 (1995); *Lamb v. Hammond,* 308 Md. 286, 518 A.2d 1057 (1987); *Duffy v. Conaway,* 295 Md. 242, 455 A.2d 955 (1983); *McNulty v. Board of Supervisors of Elections of Anne Arundel County,* 245 Md. 1, 224 A.2d 844 (1966); *Mahoney v. Board of Supervisors of Elections of Queen Anne's County,* 205 Md. 325, 108 A.2d 143 (1954); *Moore v. Bay,* 149 Md. 286, 131 A. 459 (1925).[9]

Moreover, in this State, the action of Election Supervisors, in counting or rejecting ballots, is not subject to review by mandamus in the absence of conduct that is fraudulent, arbitrary or in violation of law. *See Mahoney, supra,* 205 Md. at 336, 108 A.2d at 147–48; *McNulty, supra,* 245 Md. at 8, 224 A.2d at 848; *Love,* 187 Md. at 146, 49 A.2d at 78 (1946); *Roe v. Wier,* 181 Md. 26, 28 A.2d 471 (1942); *Fitzgerald v. Quinn,* 159 Md. 543, 151 A. 660 (1930); *White v. Laird,* 127 Md. 120, 96 A. 318 (1915). On the other hand, "where a Board of Election Supervisors has made an obvious mistake of law in counting or rejecting ballots, the court has the power to correct such mistake." *Mahoney,* 205 Md. at 336, 108 A.2d at 148. Stated differently, "a clear mistake of law, however honest, is an 'arbitrary' action, reviewable on mandamus [and] illegal action is reviewable, as such, without characterizing it as 'arbitrary.' " *Hammond v. Love,* 187 Md. at 145, 49 A.2d at 78.

In *Mahoney,* the petitioner alleged that ballots containing ambiguous marks were improperly counted in a primary elec-

---

**9.** Because the propriety of the issuance of the writ of mandamus is dispositive of this case, we need not, and, therefore, will not, address the relevance, or sufficiency, of the evidence as to how Ms. Smith intended to vote.

tion for the Democratic nomination for governor. Upholding
the challenge, we held that "the provision for the rejection of
any ballot on which there is any mark 'other than the cross-
mark in a square opposite the name of a candidate' is manda-
tory." 205 Md. at 337, 108 A.2d at 148. Similarly, in *Ham-
mond v. Love*, we held that the writ should be issued where
the Election Supervisors of Baltimore County, in direct con-
travention of a provision of the Election Law requiring judges
of election to reject any ballot which is not signed or initialed
by the judge who held the ballot, had admittedly counted a
number of ballots which did not contain the signature or
initials of a judge of election. 187 Md. at 146, 49 A.2d at 78.
The Court explained the reason for that result, even when
there was no finding or evidence of any fraud on the part of
the election officials, either to disenfranchise the voters or for
any other purpose, *id.* at 142, 49 A.2d at 76:

> "It is unfortunate that voters should lose their votes by
> oversight of election officials—and by their own failure to
> notice that they have not been given authenticated ballots.
> But, as has often been said, it would be a greater evil for the
> courts to ignore the law itself by permitting election officials
> to ignore statutory requirements designed to safeguard the
> integrity of elections, i.e., the rights of all the voters. It is
> common knowledge, evident on the face of the election laws,
> that in Maryland, as elsewhere, for upwards of fifty years,
> the peremptory requirement of initialing ballots has been
> deemed by the Legislature an important safeguard in order
> to authenticate ballots by a definite rule which leaves little
> or no discretion to election officials. If this long-established
> safeguard has become unnecessary, it is not for this Court
> to change or abolish it."

*Id.* at 149, 49 A.2d at 80.

A different result obtains when there is conduct by election
officials that might amount to negligence and is certainly
"administrative error," so long as the conduct does not violate
the law or amount to fraud or arbitrary conduct. *See McNul-
ty*, 245 Md. at 9, 224 A.2d at 848. There, one of the losing
candidates in the democratic primary election for State Senate

from a district in Anne Arundel County sought, by mandamus, to have the County Election Board award to him 136 votes cast in the blank space below his name, arguing that they were cast on the "bottom line" for democratic voters and his campaign slogan was "vote the bottom line," his being the last name on the democratic ballot. *Id.* at 7, 224 A.2d at 847. The voters were unable to cast votes on that line because election officials failed, on 39 of 49 machines, to cover, and thus lock, the blank spaces, which in turn was due to a shortage of covers, of which the Board was unaware until after the election. Acknowledging "[t]hat the Board made an administrative error, in not seeing to it that there were sufficient metal covers to lock all of the levers over all blank spaces on the voting machines under their supervision", *id.* at 9, 224 A.2d at 848, and regretting the position the Board's negligence placed the petitioner in, *id.* at 13, 224 A.2d at 851, but noting the absence of "any hint of fraud or chicanery attributable to any of the parties," the Court held that mandamus did not lie and, hence, the trial court did not err in refusing to issue the writ.

To like effect is *Fowler v. Board of Supervisors of Elections*, 259 Md. 615, 270 A.2d 660 (1970), in which the issue also was "whether or not eligible voters who sought to cast a . . . vote were deprived of votes and whether or not, had they voted, this vote would have changed the outcome of the election." *Id.* at 618–19, 270 A.2d at 662. There, the evidence established that:

"(a) some voting machines had not been properly 'zeroed' before the first vote was cast; (b) some machines had not been correctly programmed so that Republican candidates in one sub-district were listed on machines placed in another sub-district (in the afternoon the errors were corrected and the polls in the affected places stayed open to Republican voters for an additional two hours, until 10:00 p.m., and this fact was frequently and widely announced on television and radio); (c) some machines had levers that were locked; (d) a number of service men from the headquarters of the voting machine company were flown to the County on the day of

the election to repair and adjust machines and this caused delay; (e) the official records and reports of these repairmen were informally made and not in strict conformity with the directives of the statutes; (f) unauthorized persons repaired and adjusted the machines; (g) levers were operative at some blank spaces; and (h) security was not as tight as it should have been at the warehouse where the machines were taken after the election."

*Id.* at 617, 270 A.2d at 661. The trial court found facts, with which this Court concurred, as follows:

"[T]hese irregularities occurred during the primary election and ... they had passed the point of being minor, and, although that is a relative term, you could very well say that some irregularities were extremely serious and of major proportions."

\* \* \*

"There was no evidence whatever adduced or proffered in this case that there was any improper or illegal attempt either to add to or reduce the proper vote of any particular candidate—in other words, the kind of fraud which would result in some one or more people causing the candidate who should have been elected to be rejected and some other candidate elected instead. That is not alleged here, nor is there any proof whatever of that. Further, there is no evidence of any specific individual who was not permitted to vote. There is some evidence that people who sought to vote were not able to, there is some evidence that some of those people did not return and there is evidence that some said they were not going to return but there is no evidence whether they did or did not return. But we have no evidence in the case of any person by name who sought to vote and was not permitted and did not vote that day."

*Id.* at 618, 270 A.2d at 661. *See Roe v. Wier,* 181 Md. at 30, 28 A.2d at 473 (mandamus does not lie to review decision of the

Supervisors of Elections [10] to count ballots that election judge initialed as required, but with an indelible pencil, rather than in ink as the statute provided); *White v. Laird*, 127 Md. at 125, 96 A. at 320 (same, except the initial by indelible pencil, rather than black lead pencil); *Fitzgerald v. Quinn*, 159 Md. at 547, 151 A. at 662, (where, in a case of alleged improperly initialed ballots, fraud, or mere arbitrary action by the Board of Supervisors, is not shown on the face of the papers, and there is no failure of the Supervisors to function and to render the decision which the Statute calls for, the court has no right to review, and no power to issue a writ of mandamus).

*Lamb v. Hammond*, 308 Md. 286, 518 A.2d 1057 (1987), is also instructive. In that case, the issue concerned whether 12 absentee ballots should have been counted, as the Circuit Court had ordered. *Id.* at 289, 518 A.2d at 1058. Nine of them were mailed from within the United States, and, so, were governed by Md.Code (1957, 1983 Repl.Vol., 1985 Cum. Supp.) Art. 33 § 27–9(c)(1), which regards as timely an absentee ballot that:

"(i) . . . has been received by the board prior to the closing of the polls on election day; or

"(ii)

"1. . . . was mailed before election day;

"2. The United State[s] Postal Service, . . . or the postal service of any other country, has provided verification of

---

**10.** The prevailing statute in *Roe v. Wier*, 181 Md. 26, 30, 28 A.2d 471, 473 (1942), Md.Code (1957, 1966 Supp.) Art. 33 § 255, applicable to appeals to the Wicomico Board of Supervisors for a recount, and review of the actions of the judges of election, empowered the County Board of Supervisors "to hear and determine . . . to review and correct the action of the Judges of Election in their respective jurisdictions and to recanvass, recount and certify said result of said primary election. And for all other purposes of said review, recount, recanvass . . ., the said Supervisors of Elections shall act and be judges of election for counting said ballots acting as such in the premises within their respective geographical jurisdictions. . . . The said supervisors to pass upon and decide whether any ballot contested by the teller for either side shall be rejected or counted."

that fact by affixing a mark so indicating on the covering envelope; and

"3. The board receives the ballot from the United States Postal Service not later than 4 p.m. on the Wednesday following election day."

*Id.* at 305, 518 A.2d at 1066. Because the ballots in question were not received prior to the closing of the polls on election day, but were received prior to the deadline set forth in subsection (c)(1)(ii)3, to be timely, they had to satisfy the requirements of subsection (c)(1)(ii), i.e., they must have been mailed prior to election day, a fact that the postmark did not support. *Id.* at 306, 518 A.2d at 1067. Consequently, the Board rejected the ballots. *Id.* at 305–06, 518 A.2d at 1066–67. The written instructions given to the absentee voters stated, in two places, that "[a] ballot received by mail will be considered timely until 4 P.M. on the Wednesday following election day, provided it bears a postmark verifying it was mailed before election day or the signed affidavit of the voter indicates that it was marked and mailed before election day," and, so, "were at best ambiguous and at worst actually misleading." *Id.*

The timeliness of the three ballots mailed from outside the United States was controlled by § 27-9(d) and (e). *Id.* at 307, 518 A.2d at 1067. Such a ballot was received timely if it "was mailed before election day," subsection (d)(1)(ii)1, "received by the board from the United States Postal Service not later than 4 p.m. on the second Friday following the election day," subsection (d)(1)(i), and the postmark of the United States Postal Service, or the postal service of any other country, provided verification of the fact that it was mailed before election day. Subsection (d)(1)(ii)2. If the postal service of the country from which the ballot was mailed did not provide a postmark on the ballot, then the voter's affidavit that the ballot was completed and mailed before election day was sufficient. Subsection (e). All three ballots were postmarked the date of the election, prompting the Board to reject them for failure of the required verification. 308 Md. at 307–08, 518 A.2d at 1067–68. As in the case of the domestic absentee

ballots, the instructions provided by the Election Board stated in two places:

"A ballot received by mail will be considered timely until 4 P.M. on the Wednesday following election day, provided it bears a postmark verifying it was mailed before election day or the signed affidavit of the voter indicates that it was marked and mailed before election day. For a ballot received from an overseas location in a general election, the extended deadline for timeliness is the second Friday after election, provided it bears verification that it was marked and mailed before election day."

*Id.* at 308, 518 A.2d at 1068.

Conceding technical noncompliance by the absentee ballots with the statutory requirements, the appellee in *Lamb v. Hammond* offered two arguments [11] in justification of the court's judgment, one of which, "that a voter should not be disenfranchised for technical noncompliance with the statutory requirement where he or she follows the instructions of the election officials," *id.* at 309, 518 A.2d at 1068, we found "more troubling," for some [s]tates have found it appealing. *Id.* at 310, 518 A.2d at 1069, citing *In re Recount of Ballots Cast In General Election,* 457 Pa. 279, 325 A.2d 303 (1974); *In re Contest of 1979 General Election, Etc.,* 489 Pa. 404, 414 A.2d 310 (1980); *Hawkins v. Persons,* 484 So.2d 1072 (Ala.1986). Recognizing, however, the duality of the issue presented by that argument, "(1) can election officials effectively change the law by giving erroneous, ambiguous, or misleading instruc-

---

**11.** Mr. Hammond's first argument was that the postmark requirement was merely directive, only the receipt element being mandatory. The Court rejected that argument, reasoning:

"The Legislature has accorded absentee voters a special privilege not shared by other voters—the privilege of having their vote count even though received by the election officials after the polls have closed. Unqualified, or qualified only by a deadline on receipt of the ballot, that privilege could become a distinctly unfair political advantage; it would allow a group of voters actually to cast their ballots after the polls had closed, and thus open the way for some very unwholesome machinations."

*Lamb v. Hammond,* 308 Md. 286, 309–310, 518 A.2d 1057, 1068–69 (1987).

tions to the voters, and (2) can a court command a board of canvassers to credit the improper instructions rather than the law?," we rejected it, referring in the process to *Hammond v. Love,* 187 Md. at 149, 49 A.2d at 80, and its acknowledgment that innocent voters may be adversely impacted, and without recourse, by the actions and conduct of election officials. *Id.* at 311, 518 A.2d at 1069.

Article IV, captioned "Registration, Nomination and Elections," and comprising §§ C–601–C–620 of the Seat Pleasant Charter, governs Seat Pleasant municipal elections. It provides for the holding of regular elections, § C–601, and it prescribes the qualifications to vote in municipal elections. Section C–602 of the Seat Pleasant Charter provides:

"Every person who (1) is a citizen of the United States, (2) is at least eighteen (18) years of age, (3) has been a resident of the City of Seat Pleasant for at least thirty (30) days prior to the election and (4) is registered in accordance with the provisions of this Charter and City Ordinances, shall be a qualified voter of the City shall be entitled to vote at any or all City elections."

The Charter also provides for a Board of Supervisors of Elections, § C–603, and § C–605 prescribes that it is "in charge of the registration of voters, nominations, and all City elections...." Section C–607 addresses registration. In addition to reiterating that "[n]o person is entitled to vote in City elections unless he is registered," it provides for Universal Voter Registration in conjunction with Prince George's County, pursuant to Md.Code (1957, 1986 Repl.Vol., 1989 Cum. Supp.) Article 33, § 3–2 [12] and requires the City Board to

---

**12.** Pursuant to Md.Code (1957, 1997 Repl.Vol., 2000 Supp.) Art. 33, § 3–403, previously codified as § 3–2, "[a] voter residing in a municipal corporation is deemed to be registered for elections in that municipal corporation if the voter is registered with the local board for the county in which the municipal corporation is located." It then provides for the implementation of this universal registration, requiring the municipal corporation to submit to the appropriate local board a request for the development of a plan and schedule for implementation and a liaison, § (b), the designation by the local board of its liaison, § (c), and meetings for the purpose of developing a schedule and a plan. Section

"keep the registration lists up-to-date by striking from the lists persons known to have died or moved out of the City." Section C–616 sets forth the procedure for the City Board to count the vote. It states:

"The Board of Supervisors of Elections shall begin counting the votes immediately after the polls have closed. All votes shall be counted to include the regular ballot and the absentee ballots. Once the actual vote counting begins, no persons shall enter or leave the room in which the vote count is being conducted until completion of the vote count. The Board of Supervisors of Elections shall complete the vote count within twenty-four hours after the polls have closed, shall determine the number of votes cast for each candidate and shall certify this result to the Clerk of City who shall record the result in the minutes of the Council. The candidate for Mayor with the highest number of votes shall be declared elected as Mayor. The candidates for election to the vacancies as Council members with the highest number of votes shall be declared elected. The declarations shall be proclaimed by the Chairman of the Board of Supervisors of Elections within forty-eight hours after the vote count at a special public meeting. A tie vote shall be decided by special election between the tied candidates."

Explaining its issuance of the writ of mandamus, the Circuit Court said:

"We find that mandamus is an appropriate avenue for relief in this case because the City Board acted arbitrarily and capriciously in the manner that they dealt with Ms. Smith. It is evident that the City Board acted arbitrarily and

---

(d). Section (e) prescribes the contents of the plan. Once the plan is agreed upon and implemented, § (f)(1) mandates that "[t]he local board ... provide to a municipal corporation at no cost a certified list of registered voters residing within the boundaries of the municipal corporation in compliance with the plan...." The parties make no contentions concerning the plan in effect between Seat Pleasant and Prince George's County. Nor is there a dispute with regard to its being the County's responsibility to provide the City Board with the registered voters' lists.

capriciously when it prohibited Ms. Smith from voting. Moreover, as [the appellee] argued, the City Board was arbitrary and capricious in certifying the election results knowing full well that they had turned a qualified voter away in an election decided by a one vote margin."

Earlier, as we have seen, the Circuit Court found that the City of Seat Pleasant "wrongfully infringed upon Ms. Smith's fundamental right to vote." Nevertheless, its articulation of the basis for that finding revealed that, in fact, it believed that the violation of Ms. Smith's right to vote was the result of the collective errors of the City and County Boards. The City Board's failing was that it did not prevent the situation involving Ms. Smith either because, under the circumstances, it did not make sufficient efforts to contact the County Board or because it did not follow the proper procedure that would have guaranteed that someone from the County Board would have been available on municipal election day after the County Board's normal business hours. The County Board's contribution was in supplying the City Board with an incomplete documentation from which the proper list of voters could have been determined.

Because, to be qualified to vote in the Seat Pleasant municipal elections, a person must be a registered voter, Seat Pleasant Charter §§ C–602 and C–607, it was neither arbitrary nor capricious for the City Board, based upon the information available to it at the time, to refuse to allow Ms. Smith to vote. Her name was not included on the voter registration list provided by the County Board, which also did not provide City election officials with a voter authority card for Ms. Smith. In short, City election officials did not have proof on election day that Ms. Smith was registered to vote. Acting in accordance with the dictates of the Charter can hardly be deemed to be arbitrary and capricious.

Moreover, the City Board had no discretionary authority to overlook the absence of proof of a person's registration and allow that person to vote. Had they done so, surely, the City election officials would have acted arbitrarily and capriciously.

Whether, as the Circuit Court suggested, there should have been provision made for a contingent vote, when the registration of a person is contested and there is no verification, the fact is that the Charter does not provide for such a contingency.

 Nor are the reasons that the City Board was unable to verify the registration status of Ms. Smith a basis for the relief granted. As indicated, there is no allegation that the City Board acted fraudulently; as in *Fowler*, 259 Md. at 617, 270 A.2d at 661, there is neither an allegation nor evidence that the Board made any improper or illegal attempt to increase or to reduce the vote of any of the mayoral candidates. In any event, they do not provide proof that the City Board acted arbitrarily and capriciously. Failing to make arrangements to have a County Board employee available after hours to verify registration statuses of potential voters and making only one phone call in an attempt to verify Ms. Smith's registration may have been, as in *McNulty*, an administrative error, 245 Md. at 9, 224 A.2d at 848, or even negligence, 245 Md. at 13, 224 A.2d at 851, but such conduct is not arbitrary and capricious conduct justifying the issuance of the writ of mandamus. And it does not rise to the level of the affirmative, misleading conduct of the election officials that caused the court in *Lamb v. Hammond* to err. *See* 308 Md. at 312, 518 A.2d at 1070.

 The Circuit Court's finding of arbitrariness and capriciousness in the City Board's certification of the mayoral result meets no kinder fate. Section C–616 requires the City Board to begin the vote count—counting both the regular and absentee ballots—immediately after the polls close and to continue the count until completed, which is mandated to be within 24 hours of the polls' closing. Having thus determined the number of votes cast for each candidate, § C–616 instructs that the City Board is to certify the results to the Clerk of the City.[13] By counting the votes actually cast, by determining the

---

13. Section C–616 specifically provides: "The declarations shall be proclaimed by the Chairman of the Board of Supervisors of Elections

number of votes each candidate received and by certifying the result to the Clerk of the City, the City fully complied with the requirements of § C–616. That section contains no provision investing the City Board with judicial power and, thus, empowering it "to correct the errors and mistakes that may have occurred with any officer who preceded [it] in the performance of any duty connected with the election, or to pass upon any disputed fact which may affect the result." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union,* Vol.2, 1405 (8th Ed.1927). As the appellants point out:

> "The Board's duty, as a canvassing board, 'is purely ministerial and extends only to the casting up of the votes and awarding the certificate to the person having the highest number; [it] has no judicial power.' "

(Quoting George W. McCrary, *Treatise on the American Law of Elections* 198 (4th Ed. 1897), § 261). Even if § C–616 could be read to give the City Board power to resolve ambiguity, at most it would be to determine the intention of the voters who voted and as to whose votes there was an ambiguity; it simply cannot be read to allow the Board to determine the intention of a person who did not vote, even one who did not do so due to an administrative error.

The Circuit Court relied on *Fowler* and *McNulty* in reaching its decision. In *Fowler,* this Court did state that "the decisive question was 'whether or not eligible voters who sought to cast a vote ... were deprived of votes and whether or not, had they voted, this vote would have changed the outcome of the election." 259 Md. at 618–19, 270 A.2d at 662. The comment must be considered in context—it was made in a case where the effect of numerous irregularities, some quite

---

within forty-eight hours after the vote count at a special public meeting." It appears that by reporting the results on September 25, the Board may not have complied with this aspect of its duty. No issue is made of this fact, however. The court's finding was premised on the City Board's certification of the result, having been apprised, by then, of the fact that Ms. Smith was, when she presented at the polls, eligible to vote.

serious, was considered, but where there was neither evidence nor allegation of fraud or any attempt to affect the vote of any candidate and in which the election challenge was dismissed. Thus, the comment was dictum. More important, that case is in no way comparable to the case *sub judice* or even instructive. Rather than a person whose eligibility to vote could not be determined, due admittedly to an administrative error, in *Fowler*, the Court was concerned about voters, whose qualifications were not at issue, but who might have been denied the right to vote because of the numerous irregularities.

In *McNulty*, this Court did comment that "whenever an ambiguity arises with regard to election results, every effort should be made to ascertain the intention of voters and this is the initial duty of the Board." 245 Md. at 8, 224 A.2d at 848. There, aside from the fact that we dismissed the election challenge, concluding that it was insufficient in the absence of a showing of fraud, we were referring to voters who had actually voted and not, as here, to a person who was not allowed to vote because, in accordance with the applicable law, her registration could not be verified.

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO DISMISS THE APPELLEE'S ACTION. COSTS TO BE PAID BY THE APPELLEE.

WILNER, Judge, dissenting.

The Court today holds that it is permissible for election officials to deny a properly registered voter the right to vote so long as they do so negligently and not fraudulently or arbitrarily. With respect, I dissent from that conclusion.

There is no need in this dissent to write a political treatise on the importance of the right to vote. I am sure that my colleagues agree with me that it is the fundamental underpinning of our democratic and republican form of government and must be zealously protected. It was not protected in this case. Brenda Smith, a properly registered voter was denied her

right to vote in the election for mayor and members of the city council of Seat Pleasant, Maryland.[1] She did all that she could do to exercise that right, and it was only through the inexcusable negligence of city and county election officials that she was not permitted to cast her ballot.

Had Mr. Kennedy, the declared winner in the mayoral race, won by more than one vote, I would agree that no judicial action would be appropriate, for Ms. Smith's vote would not have changed the result of the election. Here, however, Ms. Smith's vote may well have changed the result of the election; if her uncontested affidavit is accepted, it *would* have changed the result and forced a run-off election.

The Court accepts that mandamus lies to compel public officers "to perform their functions, or some particular duty imposed upon them, which in its nature is imperative, and to the performance of which the party applying for the writ has a clear legal right," at least in the absence of "any ordinary adequate legal remedy to which the party applying could have recourse," if "the court is satisfied that it is necessary to secure the ends of justice, or to subserve some just or useful purpose." Opinion at 672–73 (quoting from *George's Creek Coal & Iron Co. v. County Comm'rs of Allegany Co.*, 59 Md. 255, 259 (1883) and from *Goodwich v. Nolan*, 343 Md. 130, 680 A.2d 1040 (1996)). It follows, however, the precepts, also included in the language from earlier cases, that mandamus ordinarily does not lie when the action to be reviewed "is discretionary or depends on personal judgment," *Goodwich, supra,* 343 Md. at 145, 680 A.2d at 1047, at least in the absence of "an allegation that the action complained of was illegal, arbitrary, capricious, or unreasonable," *id.* at 146, 680 A.2d at 1048, and that the action of election officials "in counting or rejecting ballots, is not subject to review by mandamus in the

---

1. That the election was a local, municipal one does not, of course diminish its significance. The laws enacted and policies pursued by town and county governments often have a greater and more immediate effect on people's lives, fortunes, health, and welfare than laws enacted by Congress or policies pursued by the President.

absence of conduct that is fraudulent, arbitrary or in violation of law." *Ante* at 675.

There is a dual problem with that approach, as applied in this case. First, the action complained of here was not one that involved discretion or personal judgment. Election officials do not have discretion to deny a properly registered voter the right to vote. That is not a matter of "personal judgment." Second, this was not a matter of counting or rejecting a ballot, which was the issue in the cases relied upon by the court. Here, there was no ballot to be counted or rejected, because Ms. Smith was not allowed to cast one. *McNulty v. Board of Elections*, 245 Md. 1, 224 A.2d 844 (1966) and *Fowler v. Board of Elections*, 259 Md. 615, 270 A.2d 660 (1970), *cert. denied*, 400 U.S. 1024, 91 S.Ct. 583, 27 L.Ed.2d 637 (1971), make this distinction quite well.

In *McNulty*, the election officials neglected to lock the levers over blank spaces on some of the voting machines, thereby allowing voters to pull those levers. One of those blank spaces was on the bottom line. McNulty, a candidate who had urged voters to "vote the bottom line," filed an action for mandamus to require the election officials to count the votes on that bottom line as votes for him. We affirmed the dismissal of the petition, holding that the administrative error in not locking the levers did not justify calling a new election *"the reason being, that no voter was actually prevented from voting for the candidate of his choice*, if he followed the official election instructions published in the newspaper prior to the election, the directives on the specimen ballots also published, and the instructions of the Attorney General prominently posted in the polling places, and indeed, if they had followed the instructions on McNulty's own sample ballot." *McNulty, supra,* at 9, 224 A.2d at 848–49 (emphasis added).

*Fowler* also involved a problem with voting machines, leading a losing candidate to seek a new election through an action for mandamus. Although in the absence of a claim that the irregularities would have changed the result, we expressed

doubt as to Ms. Fowler's standing to seek that relief, we affirmed dismissal of the petition on the merits, holding:

> "[The trial judge] concluded, correctly we think, that under the rationale and holding of *McNulty v. Board of Elections,* 245 Md. 1, 224 A.2d 844, and cases therein cited, *the decisive question was 'whether or not eligible voters who sought to cast a vote * * * were deprived of votes and whether or not, had they voted, this vote would have changed the outcome of the election.'* His findings of fact, the accuracy of which is not really challenged, were that there was no showing that any specific individual had been deprived of his franchise and therefore no showing that the irregularities affected the result of any election contest."

*Fowler, supra,* 259 Md. at 618–19, 270 A.2d at 662 (emphasis added).

The caveat specifically mentioned in *McNulty* and *Fowler* is precisely the situation now before us. Not only was a citizen's right to vote actually denied, but the vote that she claims she would have cast would, in fact, have changed the result of the election. Those cases, as I read them, require some judicial remedy.

It should be of no consequence that, in a situation such as this, the problem arose from negligence rather than from fraud or that the negligence was somewhat diffuse—the product of carelessness on the part of several election officials. The effect is the same. The county election officials were careless in the manner in which they programmed their computer, causing it to disenfranchise a person for simply discharging her legal duty of notifying the board of a change of address. Having so misprogrammed the computer, they were careless in not checking the registration list they sent to the Seat Pleasant officials against any recent changes of address. Knowing that there was an election in Seat Pleasant and that the polls would be open until 8:00 p.m., they were careless in not making arrangements to have someone available to deal with any problems that might arise and that they would have the authority to resolve. The city officials were

careless in not checking to make sure that an appropriate county official would remain available during the hours that the polls were open and, perhaps, in not making better efforts to contact a county official when the problem with Ms. Smith arose. This was not simply a minor administrative "goof." It was a series of negligent acts or omissions on the part of responsible officials that, in combination, was almost certain to produce the kind of problem that actually arose.

The Court sweeps by all of that and holds that, in the absence of fraud or arbitrariness, there is no remedy. What if, through pure negligence, the computer had de-registered all Democrats, or all Republicans, or all people in a given precinct, or all people whose last name begins with the letter "S"? Would the Court still say, "No fraud, no remedy"?

I recognize that no election is run perfectly and that "glitches" occur despite the best intentions of the election officials, and I agree that the results of an election should not be set aside for inconsequential reasons. I accept the pronouncements from our earlier cases to that effect. This, however, is a different case-one that was foreseen in *McNulty* and *Fowler*—and it needs to be treated accordingly. I believe that the Circuit Court correctly applied the law and entered an appropriate order, and I would therefore affirm its judgment.