MAHONEY *v.* BOARD OF SUPERVISORS OF ELECTIONS OF QUEEN ANNE'S COUNTY ET AL.

MAHONEY *v.* BOARD OF SUPERVISORS OF ELECTIONS OF TALBOT COUNTY ET AL.

(Two Appeals in Separate Records)

[Nos. 57-58, October Term, 1954 (Adv.).]

*Decided, per curiam, August 4, 1954.*

*Opinion filed October 7, 1954.*

The causes were argued before BRUNE, C. J., and DELAPLAINE, COLLINS and HAMMOND, JJ.

*Clarke Murphy, Jr., Francis B. Burch* and *Hyman A. Pressman,* with whom were *William W. Mahoney* and *J. Thomas Clark* on the brief, for the appellant in both cases.

*William C. Walsh* and *Ralph W. Powers,* with whom were *Vachel A. Downes, Jr., Walter W. Claggett* and *James Elmer Thompson, Jr.,* on the brief, for the appellees in both cases.

DELAPLAINE, J., delivered the opinion of the Court.

At the primary election held in Maryland on June 28, 1954, Harry Clifton Byrd and George P. Mahoney were the candidates for the Democratic nomination for Governor of Maryland. The official canvass gave Byrd 80 votes and Mahoney 72 votes for nomination by the Democratic State Convention.

The Maryland Election Law provides that every candidate for the nomination for a State office, that is to say, an office filled by the vote of all the registered voters of the State of Maryland, shall be nominated by State

Convention, the delegates to which shall be elected by the direct vote of the registered voters belonging to the political party of which the candidate is a member; and the candidate receiving the highest vote in any county or legislative district shall receive the vote of the delegates from such county or legislative district in the State Convention. Code 1951, art. 33, sec. 64.

As the canvass after the 1954 primary election showed a majority of only 53 for Byrd in Queen Anne's County, and a majority of only 60 for Byrd in Talbot County, Mahoney petitioned the Board of Supervisors of Elections in each of those counties for a recount of the votes for the nomination for Governor. Each recount showed a different number of votes from that shown by the canvass, but each recount gave the majority to Byrd.

On July 26 Mahoney filed in the Circuit Court for Queen Anne's County a petition for *mandamus* against the Queen Anne's County Board. He alleged in that petition that, according to the canvass, Byrd received 2,035 votes, and he received 1,982. He alleged that on July 3 he petitioned the Board to recount the ballots cast in all election precincts of Queen Anne's County, and on July 22 the Board completed the recount. He alleged that among the ballots counted by the Board were ballots counted unlawfully because they contained marks other than the cross-marks in the squares opposite the names of the candidates. He alleged that the Board admitted the existence of those marks, but arbitrarily refused to reject the ballots. The Board counted 1,835 votes for Byrd, and 1,813 for Mahoney. He further alleged that if all the challenged ballots were rejected, instead of being counted, he would have the majority of votes cast for the nomination for Governor. He prayed for a writ to compel the Board to reject all ballots on which the alleged marks appeared.

On July 27 Mahoney filed in the Circuit Court for Talbot County a petition for *mandamus* against the Talbot County Board. He alleged that, according to the canvass, Byrd received 1,944 votes and he received 1,884.

He alleged that on July 8 he petitioned the Board for a recount, and the Board completed it on July 22. He alleged that some of the ballots counted by the Board were counted unlawfully because they contained invalidating marks. He further alleged that the Board arbitrarily refused to reject the ballots complained of. The Board counted 1,826 votes for Byrd and 1,769 for Mahoney.

On these appeals no ballots were presented to the Court. Attached to each petition, however, was a schedule containing reproductions of sketches of the different types of marks complained of. The type which produced the largest number of objections was a dot near a cross-mark in the square opposite the name of a candidate. Objections were made to 205 such dots before the Queen Anne's County Board, and to 86 such dots before the Talbot County Board. Objections were also made to other dots, check-marks, erasures, initials, and other marks.

Each Board filed a demurrer to the petition. Byrd, who intervened in each case, also demurred. Judge Horney, who heard the cases together, took the view that a Board of Election Supervisors, in making a recount, must determine whether each challenged ballot contains any mark other than cross-marks in the squares opposite the names of the candidates; and that since the Supervisors are required to exercise discretion in doing this work, the courts have no authority to review their decisions except when they act unlawfully, fraudulently or arbitrarily. On July 30 the judge sustained the demurrers and dismissed the petitions. Mahoney thereupon appealed from the judgments to the Court of Appeals.

The Maryland Code prescribes the procedure to be followed in suits for *mandamus*. The statute provides that upon the filing of a petition for *mandamus,* the court or judge to whom the same is addressed shall lay a rule requiring the defendant therein to show cause why a writ of *mandamus* should not issue as prayed;

and the defendant, by the day named in such order, shall file an answer to such petition, fully setting forth all the defenses upon which he intends to rely in resisting the application, which shall be verified by his affidavit. Laws 1858, ch. 285, Code 1951, art. 60, secs. 2, 3.

Although the statute prescribing the procedure in mandamus proceedings does not state that the defendant may file a demurrer to a petition for *mandamus,* the defendant is not deprived of the right to demur, but he may bring for hearing on demurrer a case in which it appears on the face of the petition that the petitioner is not entitled to the relief prayed. *Brack v. Bar Ass'n of Baltimore City,* 185 Md. 468, 473, 45 A. 2d 102.

In 1890 the Legislature of Maryland passed the Act directing that thereafter all ballots to be used and cast in any elections to be held in this State, other than primary elections, should be printed and distributed at public expense. That Act followed many parliamentary battles which were waged in different countries over the process of polling. For some years reforms had been sought to secure freedom of the voter from outside influence and to secure honesty in the counting of votes. One of the principal reforms for securing the protection of voters was the secret ballot, which was adopted for the first time in 1856 in South Australia. The Australian system spread to Europe and America to meet the growing public demand for the protection of voters. Thus the Australian ballots, as the secret paper ballots have been called, have been used in Maryland since 1890. Laws 1890, ch. 538.

In 1896 the Legislature, in a complete revision of Article 33 of the Code, entitled "Elections," strengthened the law to give further protection to voters. This Act directed that the voter shall prepare his ballot by marking a cross-mark with an indelible pencil after the name of every person for whom he intends to vote in the blank space provided therefor, and shall fold his ballot without displaying the marks thereon, and in the same way it was folded when received by him, and shall keep

it so folded until he has voted, so that nothing may be seen thereon except the signature or initials of the judge from whom he received it and the name and number written on the coupon thereof. Laws 1896, ch. 202, sec. 61, Code 1951, art. 33, sec. 79.

The Act of 1896 authorized the election judges to reject any ballots which are deceitfully folded together, and any ballots which do not have endorsed thereon the name or initials of the judge who held the ballots. Laws 1896, ch. 202, sec. 66, Code 1951, art. 33, sec. 85.

It was not until the extra session in March, 1901, that the Legislature inserted the provision, which is now in controversy, that "if there shall be any mark on the ballot other than the cross-mark in a square opposite the name of a candidate," such ballot shall not be counted. Laws 1901, ch. 2, sec. 66, Code 1951, art. 33, sec. 85.

These statutory provisions calling for the rejection of ballots are designed to enable every voter to indicate his choice in such a manner that no one could possibly see for whom he has voted, and thereby to guard against bribery and intimidation. In *Duvall v. Miller,* 94 Md. 697, 714, 715, 51 A. 570, this Court observed that the Legislature, in prescribing the method by which the voter shall prepare his ballot, evidenced an intention that the voter must strictly observe the essential requirements of the law.

The test for determining the validity of a ballot is that when an irregularity in the marking of a cross-mark apparently occurred accidentally and in pursuance of the voter's purpose to make a cross-mark as prescribed by the statute, the votes on the ballot should be counted; but when the irregularity was apparently placed on the ballot intentionally and constituted a means of identifying the ballot, the ballot should be rejected.

Thus in *Coulehan v. White,* 95 Md. 703, 53 A. 786, the following rulings were made: (1) where some of the lines of the cross-mark are double lines, the ballot is valid, as the voter may have been merely trying to make the cross-mark more distinct; (2) a spot of ink on the

back of a ballot does not invalidate it, if the judges of election thought the spot was the result of an accident; (3) a wet pencil mark on the face of a ballot does not invalidate it, if the judges presumed that the mark was made in folding it; (4) a cross-mark made with a blue pencil does not invalidate the ballot, as the statute did not prescribe the color of the pencil; (5) a dot between the arms of a cross-mark in one of the squares invalidates the ballot, as such a dot might be used as an identifying mark; and (6) a cross-mark which has a perpendicular line drawn downward from the end of one of its arms does not invalidate the ballot, as such a mark may be the result of nervousness or inexperience in the use of pencils.

The scope of the action of *mandamus* in Maryland was defined by this Court in *George's Creek Coal & Iron Co. v. Allegany County Com'rs,* 59 Md. 255, 259. Judge Alvey, who delivered the opinion in that case, described this valuable remedy in the following manner:

"Its office, as generally used, is to compel corporations, inferior tribunals, or public officers to perform their functions, or some particular duty imposed upon them, which in its nature is imperative, and to the performance of which the party applying for the writ has a clear legal right. The process is extraordinary, and if the right be doubtful, or the duty discretionary, or of a nature to require the exercise of judgment, or if there be any ordinary adequate legal remedy to which the party applying could have recourse, this writ will not be granted. The application for the writ being made to the sound judicial discretion of the court, all the circumstances of the case must be considered in determining whether the writ should be allowed or not; and it will not be allowed unless the court is satisfied that it is necessary to secure the ends of justice, or to subserve some just or useful purpose."

Thus this Court has consistently held that a writ of *mandamus* should not be issued to demand an abstract right which would be unaccompanied by any substantial benefit. *Pennington v. Gilbert,* 148 Md. 649, 129 A. 905; *Brack v. Bar Ass'n of Baltimore City,* 185 Md. 468, 45 A. 2d 102. In the instant cases it was beyond dispute that if the challenged ballots were rejected in both Queen Anne's and Talbot Counties, the petitioner would obtain the majority in both of those counties, and as a result thereof, and according to the canvass in other counties and legislative districts, he, and not Byrd, would have the majority of votes in the Democratic State Convention, which would entitle him to the nomination for Governor. Therefore, there is no question that the petitioner has not been demanding something that would be nugatory.

It is an accepted general rule that *mandamus* is the proper remedy to compel a public officer to perform a ministerial duty, but it will not be issued to compel the performance of a duty where the officer must exercise his discretion, provided that he confines himself within the limits of the powers delegated to him. *Red Star Line v. Baughman,* 153 Md. 607, 610, 139 A. 291. However, the courts, possessing inherent power to prevent violations of public trust, may grant *mandamus* requiring public officers to perform their duties without committing unlawful acts or abuses of discretion. *Kinlein v. City of Baltimore,* 118 Md. 576, 581, 85 A. 679; *Pressman v. Elgin,* 187 Md. 446, 50 A. 2d 560, 169 A. L. R. 646; *Walter v. Board of Com'rs of Montgomery County,* 179 Md. 665, 22 A. 2d 472; *Hecht v. Crook,* 184 Md. 271, 280, 40 A. 2d 673; *Heaps v. Cobb,* 185 Md. 372, 45 A. 2d 73; *Board of Supervisors of Elections for Dorchester County v. County Com'rs of Dorchester County,* 200 Md. 114, 88 A. 2d 462; 2 *Poe, Pleading and Practice, Tiffany's Ed.,* sec. 709.

The Primary Election Law of Maryland, which was approved by Governor Crothers on April 11, 1910, did not contain any provision for recounts of votes cast at

primary elections. Laws 1910, ch. 741. Accordingly the Court of Appeals in 1911 held in *Foxwell v. Beck,* 117 Md. 1, 82 A. 657, that a defeated candidate at a primary election had no right to contest the nomination of the candidate who was returned nominated. In 1912, however, the Legislature amended the statute by authorizing any candidate for a nomination, who has been defeated on the face of the returns, to petition the Supervisors of Elections for a review of the decision of the judges of election in counting the ballots. Laws 1912, ch. 2, sec. 160Y, Code 1951, art. 33, sec. 65. Thus the Election Supervisors, in making a recount of votes, are vested with discretion in determining whether a ballot should be counted or rejected; and there has never been any statutory provision for appeals to the courts from the recounts made by the Election Supervisors.

We reaffirm the rule that where the Election Supervisors have not acted in violation of law, their action in counting or rejecting ballots cast in a primary election is not subject to review by *mandamus* in the absence of fraud or arbitrary conduct. *White v. Laird,* 127 Md. 120, 96 A. 318; *Fitzgerald v. Quinn,* 159 Md. 543, 151 A. 660; *Roe v. Weir,* 181 Md. 26, 28 A. 2d 471. On the contrary, where a Board of Election Supervisors has made an obvious mistake of law in counting or rejecting ballots, the court has the power to correct such mistake. The decisions of such a Board are as fully subject to review as the decisions of any administrative agency. In *Hammond v. Love,* 187 Md. 138, 146, 49 A. 2d 75, where the Election Supervisors of Baltimore County had admittedly counted a number of ballots which did not contain the signature or initials of a judge of election, the Court of Appeals held that the provision of the Election Law that judges of election shall reject any ballot which is not signed or initialed by the judge who held the ballot is mandatory, and accordingly directed the Circuit Court for Baltimore County to issue a writ of *mandamus* to compel the Supervisors to correct the election returns.

We likewise hold that the provision for the rejection of any ballot on which there is any mark "other than the cross-mark in a square opposite the name of a candidate" is mandatory.

Judge Horney stated, in explaining why he sustained the demurrers, that he was influenced by the fact that there was a dispute as to the existence of any mark other than the cross-marks on each challenged ballot. But in deciding whether the demurrers should be sustained or overruled, only the allegations in the petitions can be considered. In an ordinary action at law a demurrer to a declaration admits the truth of all well pleaded facts alleged in the declaration and denies that the declaration is legally and substantially sufficient. 1 *Poe, Pleading and Practice, Tiffany's Ed.,* sec. 587; *Diggs v. Morgan College,* 133 Md. 264, 105 A. 157; *Kendall v. Rogers,* 181 Md. 606, 31 A. 2d 312; *Mayor and City Council of Baltimore v. Hettleman,* 183 Md. 204, 210, 37 A. 2d 335; *Crozier v. County Com'rs of Prince George's County,* 202 Md. 501, 505, 97 A. 2d 296. A demurrer to a petition for *mandamus* serves the same purpose as a demurrer to a declaration in an ordinary action at law. Of course, if the demurrer is overruled, it cannot be taken to admit the facts alleged in the petition, and the writ cannot be peremptorily granted without any further proceedings. *West v. Musgrave,* 154 Md. 40, 139 A. 551.

In the instant cases the petitions alleged not only that there were marks other than cross-marks on the challenged ballots, and that the Board of Supervisors of Elections admitted that the alleged marks could be seen on the ballots, but also that the Board, over the petitioner's protests, arbitrarily counted those ballots in violation of the Election Law. In other words, each petition definitely alleged that the Supervisors counted ballots in the course of their official duties in violation of the rules laid down by the Legislature, and the demurrers admitted all well pleaded allegations in the petition to be true. It was thus incumbent upon the

338

defendants to file answers to the petitions fully setting forth under affidavit all the defenses upon which they intended to rely in resisting the applications. For these reasons the demurrers should have been overruled.

Accordingly on August 4, 1954, this Court, by a *per curiam* order, reversed the judgments appealed from and remanded the cases for further proceedings.