844 A.2d 412

**Gail WILSON**

v.

**Stuart O. SIMMS, et al.**

**No. 72 Sept. Term, 2003.**

Court of Appeals of Maryland.

March 11, 2004.

John F. Conwell (Davis & Associates Law Offices, P.A., on brief), of Towson, for petitioner.

Scott S. Oakley, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), of Baltimore, for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, GREENE, JJ.

BATTAGLIA, Judge.

This appeal arises out of an employment dispute between Gail Wilson and the Department of Public Safety and Correctional Services ("Department"). We must decide whether Wilson could maintain a mandamus action to enforce an administrative order for her reinstatement when she sought to compel the Department to provide her with back pay, accrued leave, and retirement benefits although the administrative order omitted reference to back pay, accrued leave, and retirement benefits. We conclude that a mandamus action was not proper in this case and affirm the Court of Special Appeals.

## I. Background

### A. Facts

In 1999, as she was completing her 26th year in state service, Wilson worked for the Department of Public Safety and Correctional Services as a Personnel Specialist in the Maryland Pre–Release System. When Wilson was told that she would be reassigned, effective May 26, 1999, to the Maryland House of Correction–Annex, she began having medical problems, including nervousness, anxiety, sleeping problems, and chest pains.

Wilson did not report for duty at her new assignment on May 26, 1999 and remained on sick leave for several months thereafter. In accordance with the Department's sick leave policy, Wilson submitted a series of "sick leave occurrence slips" on a monthly basis.

On September 17, 1999, the Warden of the Maryland House of Correction–Annex, Patrick Conroy, sent a letter to the

Commissioner of the Division of Correction and requested that the State Medical Director examine Wilson "to determine her ability to perform her duties as a Personnel Specialist III." On September 22, 1999, the Commissioner forwarded the request to Dr. Peter Oroszlan, the State Medical Director at the Maryland Department of Budget and Management. On the same day, the Commissioner also asked Wilson's supervisor to obtain, within ten days, pertinent medical records, authority for the release of medical information and an essential duties checklist. Wilson was not contacted by her supervisor, however, and did not know about the Commissioner's request or that she had been referred to Dr. Oroszlan for an examination. On September 28, 1999, Dr. Oroszlan responded by letter to the Department, stating that his office had been:

in contact with the employee concerning her health related problems [and] [b]ased on the available documentation and information that we have been able to gather to this date there appears to be no specific medical contra-indication for Ms. Gail Wilson to perform the essential tasks associated with the position of a Personnel Specialist III and [perform them] on a regular basis.

A month later, Wilson received a letter dated October 19, 1999, from her supervisor in which he requested that Wilson submit certain medical information. She then received another letter from Warden Conroy dated October 20, 1999, informing her of Dr. Oroszlan's assessment and also warning Wilson that she had to either "report to work immediately" or resign from her position. The letter remonstrated Wilson that, if she did not report to work or advise the Warden if "some form of accommodation" was needed by October 26, it would be assumed that she had resigned from her position.

Wilson responded by letter on October 25, 1999, saying she could not return to work because she was "still under [her] doctor's care" and that she would inform them when she could return to work as soon as she received permission from her physician. Wilson noted that she had submitted monthly documentation to cover her absence and also included "a new medical certificate to cover [her] absence from June 1999 to

[the] present (10–25–99)." Wilson did not return to work on October 26, 1999. On November 2, 1999, Wilson received a letter from Warden Conroy, in which he notified Wilson, citing COMAR 17.04.04.03D, which governs resignations, that her employment had been terminated as of November 2, 1999 because she had been "absent without notification to [her] supervisor since October 26, 1999." [1]

Wilson ultimately submitted two "State Personnel Management System Appeal and Grievance Forms" related to this matter, one on October 28, 1999, the other on November 4, 1999. On the October 28th grievance, she stated: "I received a letter on Oct. 22, notifying me that the State Medical Director stated that I was able to return to work. In that letter, MHCA is attempting to stop my sick leave, and not accept my doctor's certificate." Wilson requested that the Department "[r]escind the memo, accept my physician's certificates, and credit me with sick leave until I am released by a real physician."

When Wilson was notified that she was being terminated on November 2, 1999, she filed another grievance form, complaining that "Managements [sic] actions were arbitrary and capricious, since my supervisor received a doctor's certificate from me on October 25 certifying me unable to work through November 1." Wilson requested the following remedy: "Rescind the termination, accept my certificate, restore my lost pay, return me to my previous position at Pre Release and stop the harassment."

---

1. COMAR 17.04.04.03D states:

An employee who is absent from duty without notifying the supervisor of the reasons for the absence and the employee's intention to return to duty is absent without leave. After 5 working days from the first day of absence, the appointing authority shall advise the employee by certified and regular mail sent to the employee's last address of record that the employee is considered to have resigned without notice. A resignation without notice may be expunged by the appointing authority when extenuating circumstances exist, and the employee had good cause for not notifying the appointing authority.

## B. Procedural History

On May 15, 2000, Administrative Law Judge Guy Avery rendered a decision, after taking evidence. In his decision, he referred to Wilson's October 28th grievance, but defined the issue of the case as "whether the Department's determination that the Grievant had resigned without notice was proper," even though the October 28th grievance preceded Wilson's purported "resignation." ALJ Avery decided that the Department incorrectly determined that Wilson had resigned without notice.[2]

Finding that Dr. Oroszlan made his decision "without having received access to [Wilson's] medical records, and without examining or even speaking personally with [Wilson]," he concluded that Dr. Oroszlan's decision that Wilson was able to perform her duties on a regular basis was "arbitrary and capricious." Consequently, he rejected the Department's argument that Wilson was no longer legitimately absent from work once Dr. Oroszlan rendered his decision, concluding that Dr. Oroszlan's determination could not serve as a "basis for determining that [Wilson] resigned without notification." He also noted that Wilson had complied with the Department's sick-leave polices by informing her supervisor of the reasons for her absence and of her intention to return. ALJ Avery, therefore, upheld Wilson's grievance, ordering the following: "The Agency's determination that the Grievant resigned without notice is, hereby, REVERSED: The Agency's letter of

2. It is unclear from the record whether ALJ Avery considered one or both of Wilson's grievances. In his Order, ALJ Avery specifically referred only to the October 28th grievance, which Wilson had filed before she had been deemed to have resigned without notice. Yet ALJ Avery clearly was aware that Wilson had been terminated from state service as of November 2, 1999, as he reversed the Department's determination that she had resigned without notice and expunged the November 2 letter stating such. Nowhere in his Order, however, did he specifically refer to Wilson's November 4 grievance, even though that is the grievance in which Wilson requested reinstatement.

The grievances themselves are dissimilar also because they refer to two different social security numbers for Wilson.

November 2, 1999, informing the Grievant that she has been determined to have resigned without notice, SHALL BE EXPUNGED from the Grievant's personnel records."

On the day after ALJ Avery's Order, Wilson's attorney sent a letter to the Department, but not to ALJ Avery, asking that Wilson "be returned to her former status effective November 2, 1999, and compensated accordingly by placing her on administrative leave with pay from that date to her return." Wilson was reinstated on July 5, 2000. For the eight-month period between the date Wilson was allegedly terminated, November 2, 1999, and the date she was reinstated, the Department did not award Wilson back pay, retirement benefits, or any sick and vacation leave.

On July 27, 2000, Wilson's attorney sent ALJ Avery a letter complaining of the Department's delay in reinstating Wilson and requesting the ALJ to provide Wilson with "full back pay and benefits" by either enforcing his May 15 Order or correcting it.

On August 17, 2000, ALJ Avery sent the Department a letter expressing his concern that his Order had not been followed in a timely manner and explaining his intentions when he issued the Order. He wrote, in relevant part:

I do not have the slightest idea why my Order in the captioned case was not followed. There apparently was no appeal for judicial review, which the agency as well as the appellant is entitled to under the Administrative Procedure Act. Thus, the delay is inexplicable.

In the interests of clarification, however, let me state that my intention in "granting" the grievance, and in reversing the agency's determination that the Grievant "resigned without notice," was to place the Grievant in the same position that she would have been in had no grievance been necessary; in other words, if the agency had never taken any action against her. Put another way: to make her whole again. I thought that my Order made that plain, but,

if not, I hope that this letter will clarify what the Order meant.

I have, however, no jurisdiction to *force* the agency to do anything. A Writ of Mandamus or other Circuit Court action would be needed to enforce my Order.

During the latter part of 2000, Wilson sent the Department documentation on several occasions supporting her contention that she was entitled to back pay, accrued leave, and benefits, which the Department refused to provide. A year later, on August 14, 2001, Wilson filed a "Petition for Writ of Mandamus and/or Writ of Certiorari" in the Circuit Court for Anne Arundel County. On June 25, 2002, Judge Ronald Silkworth granted the Department's Motion to Dismiss, stating the following:

> The A.L.J. in this case ordered that the Defendant reinstate the Plaintiff as an employee, nothing more. If the Plaintiff was unsure, or unsatisfied with the A.L.J.'s order, then the proper course of action would have been to file a timely motion to revise or reconsider his order to include the more specific relief she now requests, or in the alternative the Plaintiff could have initiated a new administrative grievance complaining that her change in status, due to the A.L.J.'s ruling, necessarily includes back pay, leave credits, and retirement contributions. Those are the appropriate legal remedies open to the Plaintiff, not the writ of mandamus. The Defendant has indeed complied with the A.L.J.'s order to reinstate the Plaintiff, thus making a mandamus action against the Defendant moot.

Wilson appealed. In an unreported opinion, the Court of Special Appeals affirmed the trial court's ruling. The intermediate appellate court determined that, while ALJ Avery, as evidenced by his August 17 letter to the Department, may have intended that Wilson receive full back pay and benefits, his intent was not expressed in his Order. For this reason, the Court of Special Appeals concluded that Wilson should have either filed another grievance or filed a petition for judicial review within thirty days of the Order pursuant to

Maryland Rules 7–202 and 7–203(a).[3] The Court of Special Appeals also determined that a writ of mandamus should not issue because "there once was an adequate administrative remedy."

Wilson filed in this Court a petition for writ of certiorari, presenting the following questions:

1. Whether the petitioner brought a proper cause of action to Maryland's court of general jurisdiction, the Circuit Court for Anne Arundel County?

2. Whether respondent should have provided petitioner with just compensation for the period of time she was wrongfully terminated?

We granted Wilson's petition. *Wilson v. Simms*, 377 Md. 275, 833 A.2d 31 (2003). We affirm the Court of Special Appeals.

## II. Discussion

Wilson asserts that ALJ Avery's Order granting her grievance and reinstating her employment required the Department to pay her salary, allow her to accrue sick and vacation leave, and contribute to her retirement benefits for the period for which she had been wrongfully terminated until she was reinstated. To support her argument, Wilson points to ALJ Avery's letter to the Department, dated August 17, 2000, which stated that his "intention in 'granting' the grievance . . . was to place [Wilson] in the same position that [she] would have been in had no grievance been necessary; in other words, if the agency had never taken any action against her."

---

**3.** Rule 7–202, Method of Securing Review, provides, in part: "(a) By Petition. A person seeking judicial review under this chapter shall file a petition for judicial review in a circuit court authorized to provide the review . . . ."

Rule 7–203, Time for Filing Action, provides, in part:

(a) Generally. Except as otherwise provided in this Rule or by statute, a petition for judicial review shall be filed within 30 days after the latest of:

(1) the date of the order or action of which review is sought;

(2) the date the administrative agency sent notice of the order or action to the petitioner, if notice was required by law to be sent to the petitioner . . . .

Wilson also contends that a writ of mandamus is the appropriate form of action to enforce her claim.

The State argues that the Circuit Court properly dismissed Wilson's claim "because the sole basis for the mandamus relief sought was the administrative order of ALJ Avery, with which [the Department] had already fully complied." The State maintains that the Department fully complied with the Order when it reinstated Wilson to her position, noting that, in his Order, ALJ Avery referred only to Wilson's October 28 grievance asking for her reinstatement and which, unlike the November 2 grievance, said nothing about back pay. Moreover, according to the State, Wilson incorrectly relies on ALJ Avery's letter, dated August 17, 2000, which was issued three months after the Order, because the letter "had no legal effect because it was neither an 'order' in its own right nor an exercise of ALJ Avery's authority under COMAR 28.02.01.28 to 'reconsider,' 'revise,' or 'correct' his Order of May 15, 2000." [4] A writ of mandamus is thus inappropriate, in the State's view, because ALJ Avery's Order "did not confer the

---

4. COMAR 28.02.01.28 states:

 28 Reconsideration and Revision.

 A. Except as provided in § B(2) of this regulation, a decision may be revised or reconsidered only by the judge who rendered the decision for which reconsideration or revision is requested.

 B. Revisory Power.

 (1) On motion of any party filed at any time, the judge may exercise revisory power and control over a final decision in the event of fraud, mistake, or irregularity in the same manner that the courts may exercise revisory power under Maryland Rule 2–535(b).

 (2) On the initiative of the judge or on the motion of any party, a judge may correct a clerical mistake in a final decision at any time in the same manner as the courts exercise revisory power under Maryland Rule 2–535(d).

 C. Reconsideration. When the judge is the final decision maker, the judge who rendered the decision may revise or reconsider the decision to the same extent as permitted by law if the agency rendered the final decision.

 D. A request for revision or reconsideration does not automatically stay the action or toll the time for filing an appeal.

 E. Proposed decisions may not be revised or reconsidered by the judge.

'clear legal right' asserted by Wilson that is essential to mandamus relief ."

## A. The History and Nature of the Writ of Mandamus

██ We begin our analysis with a discussion of the common law writ of mandamus. A court of competent jurisdiction may issue a writ of mandamus in order to compel the performance of a non-discretionary duty. In 1799, the General Court of Maryland explained:

> The writ of *mandamus* is a prerogative writ, and grantable where the public justice of the state is concerned; and commands the execution of an act where otherwise justice would be obstructed. It is denominated a prerogative writ, because the king, being the fountain of justice, it is interposed by his authority, transferred to the Court of King's Bench, to prevent disorder, from a failure of justice, where the law has established no specific remedy, and where in justice and good government there ought to be one. It is a writ of right, and lies where there is a right to execute an office, perform a service, or exercise a franchise, and a person is kept out of possession, or dispossessed of such right, and has no other specific legal remedy. It is the true specific remedy to restore a person wrongfully dispossessed of an office or function which draws after it temporal rights.

*Runkel v. Winemiller* 4 H. & McH. 429, 449 (Gen. Ct. Oct. Term 1799) (citations omitted); *see also Philip Morris Inc. v. Angeletti,* 358 Md. 689, 707–08, 752 A.2d 200, 210 (2000). More recently, in *City of Seat Pleasant v. Jones,* 364 Md. 663, 774 A.2d 1167 (2001), we described the writ of mandamus in a similar fashion:

> Mandamus is generally used 'to compel inferior tribunals, public officials or administrative agencies to perform their function or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right.'

*Id.* at 673, 774 A.2d at 1167, (quoting *Criminal Injuries Compensation Board v. Gould,* 273 Md. 486, 514, 331 A.2d 55,

72 (1975)). Commanding official action is the writ's most common use. *Walter v. Board of Comm'rs of Montgomery County,* 179 Md. 665, 668, 22 A.2d 472, 474 (1941); *see also Mahoney v. Board of Supervisors of Elections,* 205 Md. 325, 335, 108 A.2d 143, 147 (1954).

In *In re Petition for Writ of Prohibition,* 312 Md. 280, 539 A.2d 664 (1988), we explored the history and nature of mandamus at common law. Quoting Blackstone, we stated:

A writ of *mandamus* is, in general, a command issuing in the king's name from the court of king's bench, and directed to any person, corporation, or inferior court of judicature, within the king's dominions, requiring them to do some *particular* thing therein specified, which appertains to their office and duty, and which the court of king's bench has previously determined, or at least supposes, to be consonant with right and justice. It is a high prerogative writ, of a most extensively remedial nature. . . .

*Id.* at 286, 539 A.2d at 666–67 (quoting 3. W. Blackstone, *Commentaries on the Laws of England* 110 (fascimile ed. 1768)). Noting that the writ of mandamus issued out of the Court of King's Bench, we then reviewed the "evolution of that court" because we observed that its history revealed the nature and purpose of the writ itself:

In its earlier days at least, the King actually sat in the Court of King's Bench, as by later fiction he was supposed to have done. 1 W. Holdsworth, *A History of English Law* 207 (7th ed.1956) (hereinafter 1 Holdsworth). Moreover, in the medieval period, the court was closely connected with the Council. *Id.* at 209. "[T]he Curia Regis was a large undifferentiated court, composed both of the leading nobility lay and spiritual and of royal officials, by means of which the king carried on all the business of the central government—judicial, legislative, and executive." *Id.* at 477 [footnote omitted]. The notion of separation of powers—even today somewhat foreign to British constitutional law—simply did not exist. Thus this body exercised broad supervisory authority over subordinate officials, judicial and otherwise, probably without paying much heed to whether a

particular act of supervision was judicial or administrative in nature. It exercised this authority in part through the prerogative writs. *Id.* at 226.

As time passed and government became more sophisticated, or at least more complex, these arrangements began to change. Thus, towards the end of the 14th Century, the Council was becoming "more especially the organ of the executive side of the government, and Parliament of the legislative side; while the court of King's Bench was tending to become simply a court of common law, which was concerned with the judicial side of government." *Id.* at 210 [footnote omitted]. But despite this metamorphosis, the court

> preserved both in its style and in its jurisdiction traces of the days when it was a court of a very different kind. In its wide powers of control over other courts and officials, and in its wide criminal jurisdiction, it retained powers of a quasi-political nature which came to it from the days when the court held coram rege was both King's Bench and Council.

*Id.* at 211.

Thus when King's Bench became established as a common law court, it had original jurisdiction and appellate jurisdiction in both civil and criminal cases. And it had "a general superintendence over the due observance of the law by officials and others." *Id.* at 212. As we have seen, it was generally in the exercise of this power that it issued the prerogative writs. In the 16th and 17th centuries, for instance, "[b]y means of these [prerogative] writs . . . [and by other means] the doings of the justices of the peace, of the borough Courts, of courts leet, and of parishes were frequently controlled; and rules were laid down for the guidance of these authorities on points of law and procedure." 5 W. Holdsworth *A History of English Law* 420 (3d ed.1945).

*Id.* at 287–288, 539 A.2d at 667.

After reviewing the history of the Court of King's Bench, we explored governmental structure in 17th century Maryland.

During that pre-revolutionary period, we observed, the structure was similar to that of England, as it reflected a time in Maryland's history where the executive, legislative, and judicial branches of government were largely undifferentiated. *Id.* at 288, 539 A.2d at 668 (noting that Maryland's "Governor sat with this Council and this body performed administrative, legislative, and judicial functions"). "By 1638," we explained,

> the Governor and Council were sitting as a county court, which by 1642 was designated the Provincial Court. After the division of the legislature into upper and lower houses in 1649, the upper house (the Governor and Council) exercised the highest appellate authority in the province. But the Provincial Court "became the chief court of the province, regarded as the local equivalent of the Court of King's Bench." Like King's Bench, it exercised both original and appellate jurisdiction.

*Id.* at 288–89, 539 A.2d at 668 (citations omitted). According to pre-revolutionary sources, "the Provincial Court as well as the Court of Appeals issued the extraordinary writ of mandamus on occasion."[5] *Id.* at 289, 539 A.2d at 668 (citing *Bordley v. Lloyd,* 1 H. & McH. 27 (Prov. Ct., June Term 1709); *Mitchells Adrs. v. Majsty* (1715), reported in C. Bond, *Proceedings of the Maryland Court of Appeals 1695–1729,* 196–197 (1933)). These sources, however, did not discuss the genesis of the court's power to issue the writ of mandamus. *Id.*

---

**5.** Section 56 of the Maryland Constitution of 1776 created the Court of Appeals:

> That there be a court of appeals, composed of persons of integrity and sound judgment in the law, whose judgment shall be final and conclusive in all cases of appeal, from the general court, court of chancery, and court of admiralty; That one person of integrity and sound judgment in the law, be appointed chancellor; That three persons of integrity and sound judgment in the law, be appointed judges of the court now called the provincial court; and that the same court be hereafter called and known by the name of *the general court;* which Court shall sit on the western and eastern shores for transacting and determining the business of the respective shores, at such times and places as the future legislature of this State shall direct and appoint.

After the Revolutionary War, the Maryland General Court succeeded the Provincial Court, and the Court of Appeals succeeded the Colonial Court of Appeals and was given authority to hear appeals from the General Court, the Court of Chancery and the Court of Admiralty. *See* Md. Const. of 1776, § 56.[6] In 1838, in *Kendall v. United States,* 37 U.S. (12 Pet.) 524, 9 L.Ed. 1181 (1838), the Supreme Court of the United States had occasion to consider whether the Maryland General Court had the power to issue a writ of mandamus in 1801, and it concluded that Maryland courts, indeed, had such a power. *Id.* at 621, 9 L.Ed. at 1219. As we noted in *In re Petition for Writ of Prohibition,* Supreme Court Chief Justice Taney, writing for the dissent but agreeing with the majority with respect to the power of Maryland courts to issue writs of mandamus, explicitly pointed to the source of the Maryland judiciary's mandamus power when he "asserted that the Provincial Court possessed this power because its jurisdiction was co-extensive with the dominions of the lord proprietary and because the Provincial Court was to Maryland what [the] King's Bench was to England at common law." 312 Md. at 290, 539 A.2d at 668 (citing *Kendall,* 37 U.S. (12 Pet.) at 630–32, 9 L.Ed. at 1223–24 (Taney, C.J., dissenting)). As Chief Justice Taney explained, the mandamus power was vested in the General Court when Maryland declared its independence from England:

> When the revolution of 1776 took place, the same system of jurisprudence was adopted; and the fifty-sixth article of the constitution of Maryland provided, 'that three persons of integrity and sound judgment in the law, be appointed judges of the court now called the provincial court, and that the same court be hereafter called and known by the name of the general court.' No further description of the jurisdiction and powers of the general court is given. It, therefore, in the new order of things, was clothed with the same powers and jurisdiction that had belonged to the provincial

---

6. The General Court was abolished by constitutional amendment in 1805.

court before the revolution. In other words, the general court was, in the state of Maryland precisely what the court of king's bench was in England.

*Kendall,* 37 U.S. (12 Pet.) at 630–32, 9 L.Ed. at 1223–24. Taney's view reflected the view of the General Court of Maryland in *Runkel v. Winemiller,* where that Court concluded that the source of Maryland courts' power to issue a writ of mandamus derived from the Court of King's Bench. 312 Md. at 290, 539 A.2d at 668 (citing *Runkel,* 4 H. & McH. at 449 (noting that the General Court had the same power that the Court of King's Bench has with respect to issuing a writ of mandamus and stating "[t]he position that this Court is invested with similar powers, is generally admitted, and the decisions have invariably conformed to it; and whence the inference is plainly deducible, that this court may, and of right ought, for the sake of justice, to interpose in a summary way to supply a remedy where, for the want of a specific one, there would otherwise be a failure of justice")).[7]

██ We emphasize that the power to issue writs of mandamus originally derived from the Court of King's Bench in order to stress the fact that the writ of mandamus is an "extraordinary remedy" because it retained, in large part, its executive character as it is a mechanism by which the court

---

7. Today, Section 3–8B–01 of the Courts and Judicial Proceedings Article provides Maryland courts with the power to issue writs of mandamus. *See* Maryland Code, § 3–8B–01 of the Courts & Judicial Proceedings Article (1974, 2002 Repl.Vol.)("A court of law has jurisdiction in an action for mandamus."); *see also* Code, § 10–222.1(e) of the State Government Article (1984, 1999 Repl.Vol., 2003 Supp.) ("A party in an action for civil enforcement of an administrative order may request, and a court may grant, one or more of the following forms of relief: ... a writ of mandamus....").

In *Ipes v. Board of Fire Com'rs,* 224 Md. 180, 184–85, 167 A.2d 337, 339–40 (1961), we explored the statutory history of the writ of mandamus. In Chapter 78 of the Acts of 1828, the Maryland Legislature addressed some of the technical problems generated by common-law mandamus practice. *Id.* at 185, 167 A.2d at 340. Some problems continued, however, and the Legislature subsequently passed Chapter 285 of the Acts of 1858, which became Article 60 of the Maryland Code. *Id.* In Chapter 142 of the Acts of 1978, the current section authorizing mandamus, Section 3–8B–01, was enacted.

enforces the law. *See In re Petition for Writ of Prohibition,* 312 Md. at 287–288, 539 A.2d at 667. Nevertheless, the court exercises the power with caution, treading carefully so as to avoid interfering with legislative prerogative and administrative discretion. *Lamb v. Hammond,* 308 Md. 286, 292, 518 A.2d 1057, 1060 (1987)(quoting *Hammond v. Love,* 187 Md. 138, 144, 49 A.2d 75, 77 (1946)).

Ordinarily, a writ of mandamus should issue only in those cases where another adequate remedy does not exist and where "clear and undisputable" rights are at stake. *Walter,* 179 Md. at 668, 22 A.2d at 474. With respect to adequate remedies, "[i]t is well settled in this State that a writ of mandamus will not be granted where the petitioner has a specific and adequate legal remedy to meet the justice of the particular case and where the law affords [another] adequate remedy." *Philip Morris Inc.,* 358 Md. at 712, 752 A.2d at 212; *Hummelshime v. Hirsch,* 114 Md. 39, 46–47, 79 A. 38, 42 (1910). A writ of mandamus, therefore, "will not lie if there be another legal remedy, but that remedy must be specific and adequate to the object in view, 'framed to effect directly the desired end' ... [and it] must afford 'complete satisfaction, equivalent to a specific relief.'" *Harwood v. Marshall,* 9 Md. 83, 98 (1856).

Moreover, a writ of mandamus will not lie if the petitioner's right is unclear or issues only at the discretion of a decision maker. "[I]f the right be doubtful, or the duty discretionary, or of a nature to require the exercise of judgment, or if there be any ordinary adequate legal remedy to which the party applying could have recourse, [the] writ will not be granted." *City of Seat Pleasant,* 364 Md. at 673, 774 A.2d at 1172 (quoting *George's Creek Coal & Iron Co.,* 59 Md. at 259). "[A] legal right and a corresponding duty" must therefore exist before a court may grant a writ of mandamus. *Buchholtz v. Hill,* 178 Md. 280, 288, 13 A.2d 348, 352 (1940); *see also Freeman v. Local 1802, American Federation of State, County and Municipal Employees Council 67,* 318 Md. 684, 692, 569 A.2d 1244, 1248 (1990). Further, where the

exercise of discretion is permitted, mandamus ordinarily will not lie. *Freeman,* 318 Md. at 692, 569 A.2d at 1248; *see also Goodwich v. Nolan,* 343 Md. 130, 145, 680 A.2d 1040, 1047 (1996); *Board of Educ. v. Secretary of Personnel,* 317 Md. 34, 46, 562 A.2d 700, 706 (1989); *Maryland Action for Foster Children, Inc. v. State,* 279 Md. 133, 138, 367 A.2d 491, 494 (1977); *Tyler v. Baltimore County,* 251 Md. 420, 425, 247 A.2d 704, 707 (1968); *Green v. Purnell,* 12 Md. 329, 336 (1858)(stating that a writ of mandamus "cannot issue in a case where discretion and judgment are to be exercised by the officer; and it can be granted only where the act required to be done is merely ministerial, and the relator without any other adequate remedy").

## B. Wilson's Request for a Writ of Mandamus

In this case, the Court of Special Appeals correctly affirmed the trial court's ruling granting the State's motion to dismiss. As we have stated, normally in order for a mandamus action to lie, a clear and undisputable legal right and corresponding duty must be present. *Buchholtz,* 178 Md. at 288, 13 A.2d at 352. In Wilson's case, ALJ Avery's Order clearly and indisputably conferred upon her the legal right to have her employment reinstated, as he reversed the Department's determination that Wilson had resigned without notice and expunged the November 2 letter informing her as such. It is much less clear, however, as to whether the Order conferred upon Wilson the legal right to receive back pay, accrued leave, and retirement benefits for the period she was wrongfully terminated.

### 1. Clear and Undisputable Right Required for Mandamus

■ Wilson urges that ALJ Avery's Order reinstating her to her position necessarily includes by implication back pay, accrued leave, and retirement benefits. Because ALJ Avery's Order does not refer to such, Wilson's argument is only tenable if there is legal authority clearly providing that reinstatement necessarily includes back pay, accrued leave, and/or

retirement benefits. Our review of the State's employee grievance process suggests otherwise.

As we explained in *Robinson v. Bunch*, 367 Md. 432, 788 A.2d 636 (2002), the General Assembly established "a statutory administrative and judicial review remedy for state employees who claim that they have not been compensated in accordance with applicable legal requirements." *Id.* at 445, 788 A.2d at 644. Maryland Code, Sections 12–101 through 12–405 of the State Personnel and Pensions Article provide "a detailed administrative grievance procedure" for state employees working in the executive branch. *Id.* Section 12–103 of the State Personnel and Pensions Article establishes the "exclusivity of the employee grievance proceeding remedy," providing that "[u]nless another procedure is provided for by this article, the grievance procedure is the exclusive remedy through which a non-temporary employee in the State Personnel Management System may seek an administrative remedy for violations of the provisions of the article." *Id.* at 445, 788 A.2d at 645.

 In a grievance proceeding, an administrative law judge or final decision maker is authorized by Section 12–303 of the State Personnel and Pensions Article (1993, 1997 Repl.Vol.) to grant "any appropriate remedy" available under Section 12–402(a), which provides:

> Except as provided in subsection (b) of this section, the remedies available to a grievant under this title are limited to the restoration of the rights, pay, status, or benefits that the grievant otherwise would have had if the contested policy, procedure, or regulation had been applied appropriately as determined by the final decision maker.

Section 12–402(a) defines the remedies that may be provided to aggrieved state employees; it does not guarantee them. Rather, under Section 12–402(b), the ALJ, depending upon the circumstances, "may order an appointing authority to grant back pay." [8] In order for a grievant such as Wilson to be

---

8. Section 12–402(b) of the State Personnel and Pensions Article (1993, 1997 Repl.Vol.) provides:

entitled to these remedies, the ALJ or decision maker must clearly and indisputably "determine" them because, although the statute allows those remedies to be provided, it does not explicitly command it. *See Robinson,* 367 Md. at 445, 788 A.2d at 644–45 (" '[B]ack pay' is expressly stated to be one of the remedies which a decision maker can award under the grievance procedure."); *Comptroller v. Nelson,* 345 Md. 706, 716, 694 A.2d 468, 473 (1997)(concluding that the grievance procedure includes addressing pay disputes); *Briscoe v. Health Department,* 323 Md. 439, 454, 593 A.2d 1109, 1116 (1991). *See also Williams v. Fitzhugh,* 147 Md. 384, 388, 128 A. 137, 138 (1925)(noting, in a case where a schoolteacher sought pay for a period during which he was dismissed due to no fault of his own, that an action for a writ of mandamus might lie "[i]f it could be shown that there is in the custody of state officials, not amenable to suit at law, a salary fund to which the appellant is entitled, and the payment of which is a clear legal duty, not involving the exercise of discretion"); *Frosburg v. State Dept. of Personnel,* 37 Md.App. 18, 33, 375 A.2d 582, 591, *cert. denied,* 281 Md. 737 (1977) (holding that mandamus did not lie because "the appellants have shown neither a clear legal duty on the part of the Department of Personnel to pay back pay under the circumstances of this case, nor have they indicated to the trial court a specific sum or fund from which they are entitled to be paid"). Because the statute does not require Wilson to be granted back pay, accrued leave, or retirement benefits, Wilson's mandamus action does not lie "to compel performance of a statutory duty." *Eck v. State Tax Commission,* 204 Md. 245, 255, 103 A.2d 850, 855 (1954); *see also Cahill v. Mayor and City*

---

(1) A decision maker at Step Two or Step Three of the grievance procedure may order an appointing authority to grant back pay.
(2)(i) In a re-classification grievance back pay may be awarded for a period not exceeding 1 year before the grievance procedure was initiated.
(ii) A back pay order under this paragraph is in the discretion of the Secretary and the Office of Administrative Hearings.
(3) Subject to the limitations in Title 14, Subtitle 2 of this article, an appointing authority shall carry out a back pay order issued under this subsection.

*Council of Baltimore,* 173 Md. 450, 455, 196 A. 305, 307–08 (1938)(explaining the limitation of purpose on the writ is a means by which we exercise discipline when we use our power to issue the writ, doing so only when there is "an ascertainably clear legal right and duty").

Wilson also attempts to show that she had a clear right to back pay, accrued leave, and retirement benefits because ALJ Avery's "intent" to grant her such is evidenced by his August 17, 2000, letter to the Department that expressed his concern that the Department had not implemented his Order in a timely fashion or made Wilson "whole" as if the termination had never happened. This letter, as the State correctly points out, is not an exercise of ALJ Avery's authority under COMAR 28.02.01.28 to reconsider or correct his Order.[9] Moreover, in the very letter Wilson relies on, it is evident that

---

9. COMAR 28.02.01.28 provides that an ALJ's decision may be revised in some circumstances on motion by any party at any time in the case of "fraud, mistake, or irregularity." *See* note 4, *supra.*

Although Wilson's counsel wrote the ALJ a letter about his concerns regarding how the Department was implementing ALJ Avery's Order, he did not file a motion for reconsideration pursuant to 28.02.01.28. As the Court of Special Appeals pointed out, Wilson's attorney did request that ALJ Avery enforce or amend his Order pursuant to COMAR 28.02.01.08, which covers the powers and duties of judges, and COMAR 28.02.01.22, which relates to an ALJ's decisions or proposed decisions.

In addition, although the rule allows clerical mistakes to be corrected at any time "on the initiative of the judge or on the motion of any party," ALJ Avery's Order could not be remedied as Wilson sought based on an argument that ALJ Avery made a clerical mistake because ALJ Avery's purported error was one of judicial character. As we explained in *In re Timothy C.,* 376 Md. 414, 430 n. 10, 829 A.2d 1024, 1033 n. 10 (2003):

> the test to be applied in determining whether an error in a judgment is of a judicial character, or a mere clerical mistake which may be corrected in the court where it was made at any time, saving intervening rights of third parties and with due regard to equitable considerations, is whether the error relates to something that the trial court erroneously omitted to pass upon or considered and passed upon erroneously, or a mere omission to preserve of record, correctly in all respects, the actual decision of the court, which in itself was free from error."

Under this test, any effort on Wilson's part to support a motion to reconsider based on the argument that ALJ Avery committed a clerical

ALJ Avery concedes that his Order may have been less than clear and that the time period for judicial review or correcting his Order had passed. As the State points out, ALJ Avery's May 15, 2000 Order was a final Order. *See* Code, § 12–205(c)(2)(ii) of the State Personnel and Pensions Article (stating that the "decision of the Office of Administrative Hearings is the final administrative decision"). Consequently, the ALJ's later letter explaining his earlier Order is to no effect.

 Finally, we observe that, in her argument, Wilson incorrectly conflates what are really two different types of mandamus actions: one for the judicial enforcement of non-discretionary acts, the other for the judicial review of adjudicatory administrative decisions. Requiring a public official to perform a non-discretionary duty or function—to enforce the law—is the original common-law function of mandamus. *City of Seat Pleasant*, 364 Md. at 673, 774 A.2d at 1172. Mandamus may also issue, however, for the purpose of judicial review of administrative decisions where there is "both a lack of an available procedure for obtaining review *and* an allegation that the action complained of is illegal, arbitrary, capricious or unreasonable." *Goodwich*, 343 Md. at 146, 680 A.2d at 1048. As we explained in *Heft v. Maryland Racing Comm'n*, 323 Md. 257, 273, 592 A.2d 1110, 1118 (1991), mandamus actions often served as a means to obtain judicial review of administrative actions prior to the Administrative Procedure Act (APA). After the APA was enacted, most mandamus actions in this regard became unnecessary. *Id.* When Wilson argues that her mandamus action lies to enforce ALJ Avery's Order because the Department's actions were arbitrary and capricious, she merges two different lines of analysis.

### 2. Wilson's Mandamus Action was Not Moot or Nugatory

Although we agree with the Court of Special Appeals that Wilson received what the ALJ ordered, her mandamus action

---

error when he omitted to include as part of her remedy an award of back pay, accrued leave, and retirement benefits would have failed.

was not nugatory or moot as the appellate court suggested because she sought to use the writ to seek remedies other than that which was granted to her. While the Court of Special Appeals was correct in pointing out that a mandamus writ will not lie where the petitioner seeks to enforce a duty that already has been performed, *Mahoney,* 205 Md. at 334–35, 108 A.2d at 147, it incorrectly applied this principle to Wilson's action. Wilson's mandamus action was not for the purpose of reinstatement; rather, she sought to use the writ to receive back pay, accrued leave, and retirement benefits. Because these were not remedies that had already been given to her, the Court of Special Appeals incorrectly concluded that her mandamus action did not lie because the Department already had performed its duty to Wilson by reinstating her. As we described *supra,* Wilson's mandamus action failed because she had no clear right to the remedies she sought.

### III. Conclusion

A mandamus action fails when the right pursued is doubtful. Wilson's mandamus action thus did not lie in this case because she had no clear or indisputable right to back pay, accrued leave, or retirement benefits. Wilson did have a clear and undisputable right pursuant to ALJ Avery's Order to be reinstated, with which the Department complied when it reinstated Wilson. The Court of Special Appeals correctly affirmed the trial court's conclusion that Wilson's mandamus action was improper.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.*

Concurring Opinion by RAKER, Judge.

I join in the judgment only.